# STANLEY *v.* ILLINOIS

No. 70–5014. Argued October 19, 1971—Decided April 3, 1972

WHITE, J., delivered the opinion of the Court, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, and in Parts I and II of which DOUGLAS, J., joined. BURGER, C. J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 659. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Patrick T. Murphy* argued the cause and filed a brief for petitioner.

*Morton E. Friedman,* Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were *William J. Scott,* Attorney General, and *Joel M. Flaum,* First Assistant Attorney General.

*Jonathan Weiss* and *E. Judson Jennings* filed a brief for the Center on Social Welfare Policy and Law as *amicus curiae* urging reversal.

*Calvin Sawyier* and *Richard L. Mandel* filed a brief for the Child Care Association of Illinois, Inc., as *amicus curiae.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Joan Stanley lived with Peter Stanley intermittently for 18 years, during which time they had three children.[1] When Joan Stanley died, Peter Stanley lost not only her but also his children. Under Illinois law, the children of unwed fathers become wards of the State upon the death of the mother. Accordingly, upon Joan Stanley's death, in a dependency proceeding instituted by the State of Illinois, Stanley's children [2] were declared wards of the State and placed with court-appointed guardians. Stanley appealed, claiming that he had never been shown to be an unfit parent and that since married fathers and unwed mothers could not be deprived of their children without such a showing, he had been deprived of the equal protection of the laws guaranteed him by the Fourteenth Amendment. The Illinois Supreme Court accepted the fact that Stanley's own unfitness had not been established but rejected the equal protection claim, holding that Stanley could properly be separated from his children upon proof of the single fact that he and the dead mother

---

[1] Uncontradicted testimony of Peter Stanley, App. 22.

[2] Only two children are involved in this litigation.

had not been married. Stanley's actual fitness as a father was irrelevant. *In re Stanley*, 45 Ill. 2d 132, 256 N. E. 2d 814 (1970).

Stanley presses his equal protection claim here. The State continues to respond that unwed fathers are presumed unfit to raise their children and that it is unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents before they are separated from their children. We granted certiorari, 400 U. S. 1020 (1971), to determine whether this method of procedure by presumption could be allowed to stand in light of the fact that Illinois allows married fathers—whether divorced, widowed, or separated—and mothers—even if unwed—the benefit of the presumption that they are fit to raise their children.

I

At the outset we reject any suggestion that we need not consider the propriety of the dependency proceeding that separated the Stanleys because Stanley might be able to regain custody of his children as a guardian or through adoption proceedings. The suggestion is that if Stanley has been treated differently from other parents, the difference is immaterial and not legally cognizable for the purposes of the Fourteenth Amendment. This Court has not, however, embraced the general proposition that a wrong may be done if it can be undone. Cf. *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969). Surely, in the case before us, if there is delay between the doing and the undoing petitioner suffers from the deprivation of his children, and the children suffer from uncertainty and dislocation.

It is clear, moreover, that Stanley does not have the means at hand promptly to erase the adverse consequences of the proceeding in the course of which his children were declared wards of the State. It is first

urged that Stanley could act to adopt his children. But under Illinois law, Stanley is treated not as a parent but as a stranger to his children, and the dependency proceeding has gone forward on the presumption that he is unfit to exercise parental rights. Insofar as we are informed, Illinois law affords him no priority in adoption proceedings. It would be his burden to establish not only that he would be a suitable parent but also that he would be the most suitable of all who might want custody of the children. Neither can we ignore that in the proceedings from which this action developed, the "probation officer," see App. 17, the assistant state's attorney, see id., at 29–30, and the judge charged with the case, see id., at 16–18, 23, made it apparent that Stanley, unmarried and impecunious as he is, could not now expect to profit from adoption proceedings.[3] The Illinois Supreme Court apparently recognized some or all of these considerations, because it did not suggest that Stanley's case was undercut by his failure to petition for adoption.

Before us, the State focuses on Stanley's failure to petition for "custody and control"—the second route by which, it is urged, he might regain authority for his children. Passing the obvious issue whether it would be futile or burdensome for an unmarried father—without funds and already once presumed unfit—to petition for custody, this suggestion overlooks the fact that legal custody is not parenthood or adoption. A person appointed guardian in an action for custody and control is subject to removal at any time without such

---

[3] The Illinois Supreme Court's opinion is not at all contrary to this conclusion. That court said: "[T]he trial court's comments clearly indicate the court's willingness to consider *a future* request by the father for *custody and guardianship*." 45 Ill. 2d 132, 135, 256 N. E. 2d 814, 816. (Italics added.) See also the comment of Stanley's counsel on oral argument: "If Peter Stanley could have adopted his children, we would not be here today." Tr. of Oral Arg. 7.

cause as must be shown in a neglect proceeding against a parent. Ill. Rev. Stat., c. 37, § 705–8. He may not take the children out of the jurisdiction without the court's approval. He may be required to report to the court as to his disposition of the children's affairs. Ill. Rev. Stat., c. 37, § 705–8. Obviously then, even if Stanley were a mere step away from "custody and control," to give an unwed father only "custody and control" would still be to leave him seriously prejudiced by reason of his status.

We must therefore examine the question that Illinois would have us avoid: Is a presumption that distinguishes and burdens all unwed fathers constitutionally repugnant? We conclude that, as a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him and that, by denying him a hearing and extending it to all other parents whose custody of their children is challenged, the State denied Stanley the equal protection of the laws guaranteed by the Fourteenth Amendment.

## II

Illinois has two principal methods of removing nondelinquent children from the homes of their parents. In a dependency proceeding it may demonstrate that the children are wards of the State because they have no surviving parent or guardian. Ill. Rev. Stat., c. 37, §§ 702–1, 702–5. In a neglect proceeding it may show that children should be wards of the State because the present parent(s) or guardian does not provide suitable care. Ill. Rev. Stat., c. 37, §§ 702–1, 702–4.

The State's right—indeed, duty—to protect minor children through a judicial determination of their interests in a neglect proceeding is not challenged here. Rather, we are faced with a dependency statute that empowers state officials to circumvent neglect proceedings

on the theory that an unwed father is not a "parent" whose existing relationship with his children must be considered.[4] "Parents," says the State, "means the father and mother of a legitimate child, or the survivor of them, or the natural mother of an illegitimate child, and includes any adoptive parent," Ill. Rev. Stat., c. 37, § 701–14, but the term does not include unwed fathers.

Under Illinois law, therefore, while the children of all parents can be taken from them in neglect proceedings, that is only after notice, hearing, and proof of such unfitness as a parent as amounts to neglect, an unwed father is uniquely subject to the more simplistic dependency proceeding. By use of this proceeding, the State, on showing that the father was not married to the mother, need not prove unfitness in fact, because it is presumed at law. Thus, the unwed father's claim of parental qualification is avoided as "irrelevant."

In considering this procedure under the Due Process Clause, we recognize, as we have in other cases, that due process of law does not require a hearing "in every conceivable case of government impairment of private interest." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 894 (1961). That case explained that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation" and firmly established that "what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental

---

[4] Even while refusing to label him a "legal parent," the State does not deny that Stanley has a special interest in the outcome of these proceedings. It is undisputed that he is the father of these children, that he lived with the two children whose custody is challenged all their lives, and that he has supported them.

action." *Id.,* at 895; *Goldberg* v. *Kelly,* 397 U. S. 254, 263 (1970).

The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." *Kovacs* v. *Cooper,* 336 U. S. 77, 95 (1949) (Frankfurter, J., concurring).

The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923), "basic civil rights of man," *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942), and "[r]ights far more precious . . . than property rights," *May* v. *Anderson,* 345 U. S. 528, 533 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer* v. *Nebraska, supra,* at 399, the Equal Protection Clause of the Fourteenth Amendment, *Skinner* v. *Oklahoma, supra,* at 541, and the Ninth Amendment, *Griswold* v. *Connecticut,* 381 U. S. 479, 496 (1965) (Goldberg, J., concurring).

Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony. The Court has declared unconstitutional a state statute denying natural, but illegitimate, children a wrongful-death action for the death of their mother, emphasizing that

such children cannot be denied the right of other children because familial bonds in such cases were often as warm, enduring, and important as those arising within a more formally organized family unit. *Levy* v. *Louisiana*, 391 U. S. 68, 71–72 (1968). "To say that the test of equal protection should be the 'legal' rather than the biological relationship is to avoid the issue. For the Equal Protection Clause necessarily limits the authority of a State to draw such 'legal' lines as it chooses." *Glona* v. *American Guarantee Co.*, 391 U. S. 73, 75–76 (1968).

These authorities make it clear that, at the least, Stanley's interest in retaining custody of his children is cognizable and substantial.

For its part, the State has made its interest quite plain: Illinois has declared that the aim of the Juvenile Court Act is to protect "the moral, emotional, mental, and physical welfare of the minor and the best interests of the community" and to "strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal . . . ." Ill. Rev. Stat., c. 37, § 701–2. These are legitimate interests, well within the power of the State to implement. We do not question the assertion that neglectful parents may be separated from their children.

But we are here not asked to evaluate the legitimacy of the state ends, rather, to determine whether the means used to achieve these ends are constitutionally defensible. What is the state interest in separating children from fathers without a hearing designed to determine whether the father is unfit in a particular disputed case? We observe that the State registers no gain towards its declared goals when it separates children from the custody of fit parents. Indeed, if Stanley is a

fit father, the State spites its own articulated goals when it needlessly separates him from his family.

In *Bell* v. *Burson,* 402 U. S. 535 (1971), we found a scheme repugnant to the Due Process Clause because it deprived a driver of his license without reference to the very factor (there fault in driving, here fitness as a parent) that the State itself deemed fundamental to its statutory scheme. Illinois would avoid the self-contradiction that rendered the Georgia license suspension system invalid by arguing that Stanley and all other unmarried fathers can reasonably be presumed to be unqualified to raise their children.[5]

---

[5] Illinois says in its brief, at 21–23.

"[T]he only relevant consideration in determining the propriety of governmental intervention in the raising of children is whether the best interests of the child are served by such intervention.

"In effect, Illinois has imposed a statutory presumption that the best interests of a particular group of children necessitates some governmental supervision in certain clearly defined situations. The group of children who are illegitimate are distinguishable from legitimate children not so much by their status at birth as by the factual differences in their upbringing. While a legitimate child usually is raised by both parents with the attendant familial relationships and a firm concept of home and identity, the illegitimate child normally knows only one parent—the mother. . . .

". . . The petitioner has premised his argument upon particular factual circumstances—a lengthy relationship with the mother . . . a familial relationship with the two children, and a general assumption that this relationship approximates that in which the natural parents are married to each other.

". . . Even if this characterization were accurate (the record is insufficient to support it) it would not affect the validity of the statutory definition of parent. . . . The petitioner does not deny that the children are illegitimate. The record reflects their natural mother's death. Given these two factors, grounds exist for the State's intervention to ensure adequate care and protection for these children. This is true whether or not this particular petitioner assimilates all or none

It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents.[6] It may also be that Stanley is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children.[7] This much the State

of the normal characteristics common to the classification of fathers who are not married to the mothers of their children."

See also Illinois' Brief 23 ("The comparison of married and putative fathers involves exclusively factual differences. The most significant of these are the presence or absence of the father from the home on a day-to-day basis and the responsibility imposed upon the relationship"), *id.*, at 24 (to the same effect), *id.*, at 31 (quoted below in n. 6), *id.*, at 24–26 (physiological and other studies are cited in support of the proposition that men are not naturally inclined to childrearing), and Tr. of Oral Arg. 31 ("We submit that both based on history or [*sic*] culture the very real differences . . . between the married father and the unmarried father, in terms of their interests in children and their legal responsibility for their children, that the statute here fulfills the compelling governmental objective of protecting children . . .").

[6] The State speaks of "the general disinterest of putative fathers in their illegitimate children" (Brief 8) and opines that "[i]n most instances, the natural father is a stranger to his children." Brief 31.

[7] See *In re Mark T.*, 8 Mich. App. 122, 154 N. W. 2d 27 (1967). There a panel of the Michigan Court of Appeals in unanimously affirming a circuit court's determination that the father of an illegitimate son was best suited to raise the boy, said:

"The appellants' presentation in this case proceeds on the assumption that placing Mark for adoption is inherently preferable to rearing by his father, that uprooting him from the family which he knew from birth until he was a year and a half old, secretly institutionalizing him and later transferring him to strangers is so incontrovertibly better that no court has the power even to consider the matter. Hardly anyone would even suggest such a proposition if we were talking about a child born in wedlock.

"We are not aware of any sociological data justifying the assumption that an illegitimate child reared by his natural father is less likely to receive a proper upbringing than one reared by his natural father who was at one time married to his mother, or that the

readily concedes, and nothing in this record indicates that Stanley is or has been a neglectful father who has not cared for his children. Given the opportunity to make his case, Stanley may have been seen to be deserving of custody of his offspring. Had this been so, the State's statutory policy would have been furthered by leaving custody in him.

*Carrington* v. *Rash*, 380 U. S. 89 (1965), dealt with a similar situation. There we recognized that Texas had a powerful interest in restricting its electorate to bona fide residents. It was not disputed that most servicemen stationed in Texas had no intention of remaining in the State; most therefore could be deprived of a vote in state affairs. But we refused to tolerate a blanket exclusion depriving all servicemen of the vote, when some servicemen clearly were bona fide residents and when "more precise tests," *id.*, at 95, were available to distinguish members of this latter group. "By forbidding a soldier ever to controvert the presumption of non-residence," *id.*, at 96, the State, we said, unjustifiably effected a substantial deprivation. It viewed people one-dimensionally (as servicemen) when a finer perception could readily have been achieved by assessing a serviceman's claim to residency on an individualized basis.

> "We recognize that special problems may be involved in determining whether servicemen have actually acquired a new domicile in a State for franchise purposes. We emphasize that Texas is free to take reasonable and adequate steps, as have other States, to see that all applicants for the vote actually fulfill the requirements of bona fide residence. But [the challenged] provision goes beyond such rules.

stigma of illegitimacy is so pervasive it requires adoption by strangers and permanent termination of a subsisting relationship with the child's father." *Id.*, at 146, 154 N. W. 2d, at 39.

'[T]he presumption here created is . . . definitely conclusive—incapable of being overcome by proof of the most positive character.'" *Id.,* at 96.

"All servicemen not residents of Texas before induction," we concluded, "come within the provision's sweep. Not one of them can ever vote in Texas, no matter" what their individual qualifications. *Ibid.* We found such a situation repugnant to the Equal Protection Clause.

Despite *Bell* and *Carrington,* it may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's. The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency.[8] Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

Procedure by presumption is always cheaper and easier

---

[8] Cf. *Reed* v. *Reed,* 404 U. S. 71, 76 (1971). "Clearly the objective of reducing the workload on probate courts by eliminating one class of contests is not without some legitimacy. . . . [But to] give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment." *Carrington* v. *Rash,* 380 U. S. 89, 96 (1965), teaches the same lesson. ". . . States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State. *Oyama* v. *California,* 332 U. S. 633. By forbidding a soldier ever to controvert the presumption of nonresidence, the Texas Constitution imposes an invidious discrimination in violation of the Fourteenth Amendment."

than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.[9]

*Bell* v. *Burson* held that the State could not, while purporting to be concerned with fault in suspending a driver's license, deprive a citizen of his license without a hearing that would assess fault. Absent fault, the State's declared interest was so attenuated that administrative convenience was insufficient to excuse a hearing where evidence of fault could be considered. That drivers involved in accidents, as a statistical matter, might be very likely to have been wholly or partially at fault did not foreclose hearing and proof in specific cases before licenses were suspended.

We think the Due Process Clause mandates a similar result here. The State's interest in caring for Stanley's children is *de minimis* if Stanley is shown to be a fit

---

[9] We note in passing that the incremental cost of offering unwed fathers an opportunity for individualized hearings on fitness appears to be minimal. If unwed fathers, in the main, do not care about the disposition of their children, they will not appear to demand hearings. If they do care, under the scheme here held invalid, Illinois would admittedly at some later time have to afford them a properly focused hearing in a custody or adoption proceeding.

Extending opportunity for hearing to unwed fathers who desire and claim competence to care for their children creates no constitutional or procedural obstacle to foreclosing those unwed fathers who are not so inclined. The Illinois law governing procedure in juvenile cases, Ill. Rev. Stat., c. 37, § 704-1 *et seq.*, provides for personal service, notice by certified mail, or for notice by publication when personal or certified mail service cannot be had or when notice is directed to unknown respondents under the style of "All whom it may Concern." Unwed fathers who do not promptly respond cannot complain if their children are declared wards of the State. Those who do respond retain the burden of proving their fatherhood.

father. It insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family.

## III

The State of Illinois assumes custody of the children of married parents, divorced parents, and unmarried mothers only after a hearing and proof of neglect. The children of unmarried fathers, however, are declared dependent children without a hearing on parental fitness and without proof of neglect. Stanley's claim in the state courts and here is that failure to afford him a hearing on his parental qualifications while extending it to other parents denied him equal protection of the laws. We have concluded that all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody. It follows that denying such a hearing to Stanley and those like him while granting it to other Illinois parents is inescapably contrary to the Equal Protection Clause.[10]

---

[10] Predicating a finding of constitutional invalidity under the Equal Protection Clause of the Fourteenth Amendment on the observation that a State has accorded bedrock procedural rights to some, but not to all similarly situated, is not contradictory to our holding in *Picard* v. *Connor*, 404 U. S. 270 (1971). In that case a due process, rather than an equal protection, claim was raised in the state courts. The federal courts were, in our opinion, barred from reversing the state conviction on grounds of contravention of the Equal Protection Clause when that clause had not been referred to for consideration by the state authorities. Here, in contrast, we dispose of the case on the constitutional premise raised below, reaching the result by a method of analysis readily available to the state court.

For the same reason the strictures of *Cardinale* v. *Louisiana*, 394 U. S. 437 (1969), and *Hill* v. *California*, 401 U. S. 797 (1971), have been fully observed.

The judgment of the Supreme Court of Illinois is reversed and the case is remanded to that court for proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Powell and Mr. Justice Rehnquist took no part in the consideration or decision of this case.

Mr. Justice Douglas joins in Parts I and II of this opinion.

Mr. Chief Justice Burger, with whom Mr. Justice Blackmun concurs, dissenting.

The only constitutional issue raised and decided in the courts of Illinois in this case was whether the Illinois statute that omits unwed fathers from the definition of "parents" violates the Equal Protection Clause. We granted certiorari to consider whether the Illinois Supreme Court properly resolved that equal protection issue when it unanimously upheld the statute against petitioner Stanley's attack.

No due process issue was raised in the state courts; and no due process issue was decided by any state court. As Mr. Justice Douglas said for this Court in *State Farm Mutual Automobile Ins. Co. v. Duel,* 324 U. S. 154, 160 (1945), "Since the [state] Supreme Court did not pass on the question, we may not do so." We had occasion more recently to deal with this aspect of the jurisdictional limits placed upon this Court by 28 U. S. C. § 1257 when we decided *Hill* v. *California,* 401 U. S. 797 (1971). Having rejected the claim that *Chimel* v. *California,* 395 U. S. 752 (1969), should be retroactively applied to invalidate petitioner Hill's conviction on the ground that a search incident to arrest was overly extensive in scope, the Court noted Hill's additional contention that his personal diary, which was one of the items

of evidence seized in that search, should have been excluded on Fifth Amendment grounds as well. MR. JUSTICE WHITE, in his opinion for the Court, concluded that we lacked jurisdiction to consider the Fifth Amendment contention:

"Counsel for [the petitioner] conceded at oral argument that the Fifth Amendment issue was not raised at trial. Nor was the issue raised, briefed, or argued in the California appellate courts. [Footnote omitted.] The petition for certiorari likewise ignored it. In this posture of the case, the question, although briefed and argued here, is not properly before us." 401 U. S., at 805.

In the case now before us, it simply does not suffice to say, as the Court in a footnote does say, that "we dispose of the case on the constitutional premise raised below, reaching the result by a method of analysis readily available to the state court." *Ante,* at 658 n. 10. The Court's method of analysis seems to ignore the strictures of JUSTICES DOUGLAS and WHITE, but the analysis is clear: the Court holds *sua sponte* that the Due Process Clause requires that Stanley, the unwed biological father, be accorded a hearing as to his fitness as a parent before his children are declared wards of the state court; the Court then reasons that since Illinois recognizes such rights to due process in married fathers, it is required by the Equal Protection Clause to give such protection to unmarried fathers. This "method of analysis" is, of course, no more or less than the use of the Equal Protection Clause as a shorthand condensation of the entire Constitution: a State may not deny *any* constitutional right to some of its citizens without violating the Equal Protection Clause through its failure to deny such rights to *all* of its citizens. The limits on this Court's jurisdiction are not properly expandable by the use of such semantic devices as that.

Not only does the Court today use dubious reasoning in dealing with limitations upon its jurisdiction, it proceeds as well to strike down the Illinois statute here involved by "answering" arguments that are nowhere to be found in the record or in the State's brief—or indeed in the oral argument. I have been unable, for example, to discover where or when the State has advanced any argument that "it is unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents before they are separated from their children." *Ante,* at 647. Nor can I discover where the State has "argu[ed] that Stanley and all other unmarried fathers can reasonably be presumed to be unqualified to raise their children." *Ante,* at 653. Or where anyone has even remotely suggested the "argu[ment] that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's." *Ante,* at 656. On the other hand, the arguments actually advanced by the State are largely ignored by the Court.[1]

---

[1] In reaching out to find a due process issue in this case, the Court seems to have misapprehended the entire thrust of the State's argument. When explaining at oral argument why Illinois does not recognize the unwed father, counsel for the State presented two basic justifications for the statutory definition of "parents" here at issue. See Tr. of Oral Arg. 25–26. First, counsel noted that in the case of a married couple to whom a legitimate child is born, the two biological parents have already "signified their willingness to work together" in caring for the child by entering into the marriage contract; it is manifestly reasonable, therefore, that both of them be recognized as legal parents with rights and responsibilities in connection with the child. There has been no legally cognizable signification of such willingness on the part of unwed parents, however, and "the male and female . . . may or may not be willing to work together towards the common end of child rearing." To provide legal recognition to both of them as "parents" would often be "to create two conflicting parties competing for legal control of the child."

The second basic justification urged upon us by counsel for the State was that, in order to provide for the child's welfare, "it is

All of those persons in Illinois who may have followed the progress of this case will, I expect, experience no little surprise at the Court's opinion handed down today. Stanley will undoubtedly be surprised to find that he has prevailed on an issue never advanced by him. The judges who dealt with this case in the state courts will be surprised to find their decisions overturned on a ground they never considered. And the legislators and other officials of the State of Illinois, as well as those attorneys of the State who are familiar with the statutory provisions here at issue, will be surprised to learn for the first time that the Illinois Juvenile Court Act establishes a presumption that unwed fathers are unfit. I must confess my own inability to find any such presumption in the Illinois Act. Furthermore, from the record of the proceedings in the Juvenile Court of Cook County in this case, I can only conclude that the judge of that court was unaware of any such presumption, for he clearly indicated that Stanley's asserted fatherhood of the children would stand him in good stead, rather than prejudice him, in any adoption or guardianship proceeding. In short, far from any inti-

---

necessary to impose upon at least one of the parties legal responsibility for the welfare of [the child], and since necessarily the female is present at the birth of the child and identifiable as the mother," the State has selected the unwed mother, rather than the unwed father, as the biological parent with that legal responsibility.

It was suggested to counsel during an ensuing colloquy with the bench that identification seemed to present no insuperable problem in Stanley's case and that, although Stanley had expressed an interest in participating in the rearing of the children, "Illinois won't let him." Counsel replied that, on the contrary, "Illinois encourages him to do so if he will accept the legal responsibility for those children by a formal proceeding comparable to the marriage ceremony, in which he is evidencing through a judicial proceeding his desire to accept legal responsibility for the children." Stanley, however, "did not ask for custody. He did not ask for legal responsibility. He only objected to someone [else] having legal control over the children." Tr. of Oral Arg. 38, 39–40.

mations of hostility toward unwed fathers, that court gave Stanley "merit points" for his acknowledgment of paternity and his past assumption of at least marginal responsibility for the children.[2]

In regard to the only issue that I consider properly before the Court, I agree with the State's argument that the Equal Protection Clause is not violated when Illinois gives full recognition only to those father-child relationships that arise in the context of family units bound together by legal obligations arising from marriage or from adoption proceedings. Quite apart from the religious or quasi-religious connotations that marriage has—and has historically enjoyed—for a large proportion of this Nation's citizens, it is in law an essentially contractual relationship, the parties to which have legally enforceable rights and duties, with respect both to each other and to any children born to them. Stanley and the mother of these children never entered such a relationship. The record is silent as to whether they ever privately exchanged such promises as would have bound them in marriage under the common law. See *Cartwright* v. *McGown*, 121 Ill. 388, 398, 12 N. E. 737, 739 (1887). In

---

[2] The position that Stanley took at the dependency proceeding was not without ambiguity. Shortly after the mother's death, he placed the children in the care of Mr. and Mrs. Ness, who took the children into their home. The record is silent as to whether the Ness household was an approved foster home. Through Stanley's act, then, the Nesses were already the *actual* custodians of the children. At the dependency proceeding, he resisted only the court's designation of the Nesses as the legal custodians; he did not challenge their suitability for that role, nor did he seek for himself either that role or any other role that would have imposed legal responsibility upon him. Had he prevailed, of course, the *status quo* would have obtained: the Nesses would have continued to play the role of actual custodians until either they or Stanley acted to alter the informal arrangement, and there would still have been no living adult with any legally enforceable obligation for the care and support of the infant children.

any event, Illinois has not recognized common-law marriages since 1905. Ill. Rev. Stat., c. 89, § 4. Stanley did not seek the burdens when he could have freely assumed them.

Where there is a valid contract of marriage, the law of Illinois presumes that the husband is the father of any child born to the wife during the marriage; as the father, he has legally enforceable rights and duties with respect to that child. When a child is born to an unmarried woman, Illinois recognizes the readily identifiable mother, but makes no presumption as to the identity of the biological father. It does, however, provide two ways, one voluntary and one involuntary, in which that father may be identified. First, he may marry the mother and acknowledge the child as his own; this has the legal effect of legitimating the child and gaining for the father full recognition as a parent. Ill. Rev. Stat., c. 3, § 12–8. Second, a man may be found to be the biological father of the child pursuant to a paternity suit initiated by the mother; in this case, the child remains illegitimate, but the adjudicated father is made liable for the support of the child until the latter attains age 18 or is legally adopted by another. Ill. Rev. Stat., c. 106¾, § 52.

Stanley argued before the Supreme Court of Illinois that the definition of "parents," set out in Ill. Rev. Stat., c. 37, § 701–14, as including "the father and mother of a legitimate child, or the survivor of them, or the natural mother of an illegitimate child, [or] . . . any adoptive parent,"[3] violates the Equal Protection Clause in that it

---

[3] The Court seems at times to ignore this statutory definition of "parents," even though it is precisely that definition itself whose constitutionality has been brought into issue by Stanley. In preparation for finding a purported similarity between this case and *Bell* v. *Burson,* 402 U. S. 535 (1971), the Court quotes the legislatively declared aims of the Juvenile Court Act to "strengthen the minor's family ties whenever possible, removing him from the custody of

treats unwed mothers and unwed fathers differently. Stanley then enlarged upon his equal protection argument when he brought the case here; he argued before this Court that Illinois is not permitted by the Equal Protection Clause to distinguish between unwed fathers and any of the other biological parents included in the statutory definition of legal "parents."

The Illinois Supreme Court correctly held that the State may constitutionally distinguish between unwed fathers and unwed mothers. Here, Illinois' different treatment of the two is part of that State's statutory scheme for protecting the welfare of illegitimate children. In almost all cases, the unwed mother is readily identifiable, generally from hospital records, and alternatively by physicians or others attending the child's birth. Unwed fathers, as a class, are not traditionally quite so easy to identify and locate. Many of them either deny all responsibility or exhibit no interest in the child or its welfare; and, of course, many unwed fathers are simply not aware of their parenthood.

Furthermore, I believe that a State is fully justified in concluding, on the basis of common human experience, that the biological role of the mother in carrying and nursing an infant creates stronger bonds between her and the child than the bonds resulting from the male's often casual encounter. This view is reinforced by the observable fact that most unwed mothers exhibit a concern for their offspring either permanently or at least until

---

his *parents* only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal." (Emphasis added.) The Court then goes on to find a "self-contradiction" between that stated aim and the Act's nonrecognition of unwed fathers. *Ante,* at 653. There is, of course, no such contradiction. The word "parent" in the statement of legislative purpose obviously has the meaning given to it by the definitional provision of the Act.

they are safely placed for adoption, while unwed fathers rarely burden either the mother or the child with their attentions or loyalties. Centuries of human experience buttress this view of the realities of human conditions and suggest that unwed mothers of illegitimate children are generally more dependable protectors of their children than are unwed fathers. While these, like most generalizations, are not without exceptions, they nevertheless provide a sufficient basis to sustain a statutory classification whose objective is not to penalize unwed parents but to further the welfare of illegitimate children in fulfillment of the State's obligations as *parens patriae*.[4]

Stanley depicts himself as a somewhat unusual unwed father, namely, as one who has always acknowledged and never doubted his fatherhood of these children. He alleges that he loved, cared for, and supported these children from the time of their birth until the death of their mother. He contends that he consequently must be treated the same as a married father of legitimate children. Even assuming the truth of Stanley's allegations, I am unable to construe the Equal Protection Clause as requiring Illinois to tailor its statutory definition of "parents" so meticulously as to include such unusual unwed fathers, while at the same time excluding those unwed, and generally unidentified, biological fathers who in no way share Stanley's professed desires.

---

[4] When the marriage between the parents of a legitimate child is dissolved by divorce or separation, the State, of course, normally awards custody of the child to one parent or the other. This is considered necessary for the child's welfare, since the parents are no longer legally bound together. The unmarried parents of an illegitimate child are likewise not legally bound together. Thus, even if Illinois did recognize the parenthood of both the mother and father of an illegitimate child, it would, for consistency with its practice in divorce proceedings, be called upon to award custody to one or the other of them, at least once it had by some means ascertained the identity of the father.

Indeed, the nature of Stanley's own desires is less than absolutely clear from the record in this case. Shortly after the death of the mother, Stanley turned these two children over to the care of a Mr. and Mrs. Ness; he took no action to gain recognition of himself as a father, through adoption, or as a legal custodian, through a guardianship proceeding. Eventually it came to the attention of the State that there was no living adult who had any legally enforceable obligation for the care and support of the children; it was only then that the dependency proceeding here under review took place and that Stanley made himself known to the juvenile court in connection with these two children.[5] Even then, however, Stanley did not ask to be charged with the legal responsibility for the children. He asked only that such legal responsibility be given to no one else. He seemed, in particular, to be concerned with the loss of the welfare payments he would suffer as a result of the designation of others as guardians of the children.

Not only, then, do I see no ground for holding that Illinois' statutory definition of "parents" on its face violates the Equal Protection Clause; I see no ground for holding that any constitutional right of Stanley has been denied in the application of that statutory definition in the case at bar.

As Mr. Justice Frankfurter once observed, "Invalidating legislation is serious business . . . ." *Morey* v. *Doud*, 354 U. S. 457, 474 (1957) (dissenting opinion). The

---

[5] As the majority notes, *ante*, at 646, Joan Stanley gave birth to three children during the 18 years Peter Stanley was living "intermittently" with her. At oral argument, we were told by Stanley's counsel that the oldest of these three children had previously been declared a ward of the court pursuant to a neglect proceeding that was "proven against" Stanley at a time, apparently, when the juvenile court officials were under the erroneous impression that Peter and Joan Stanley had been married. Tr. of Oral Arg. 19.

Court today pursues that serious business by expanding its legitimate jurisdiction beyond what I read in 28 U. S. C. § 1257 as the permissible limits contemplated by Congress. In doing so, it invalidates a provision of critical importance to Illinois' carefully drawn statutory system governing family relationships and the welfare of the minor children of the State. And in so invalidating that provision, it ascribes to that statutory system a presumption that is simply not there and embarks on a novel concept of the natural law for unwed fathers that could well have strange boundaries as yet undiscernible.