■ In the Matter of JEWISH CHILD CARE ASSOCIATION, on Behalf of ALICE DAPHNE K., Appellant, v FAYE K., et al., Respondents. In the Matter of JEWISH CHILD CARE ASSOCIATION, on Behalf of BOAZ AHARON K., Appellant, v FAYE K., et al., Respondents.—In two proceedings, each, *inter alia,* to terminate parental rights, petitioner, an authorized agency, appeals from two orders (one as to each child) of the Family Court, Queens County, both dated June 28, 1977, each of which, after a hearing, dismissed a petition. Orders reversed, on the law, without costs or disbursements, and proceedings remanded to the Family Court for further proceedings consistent herewith. At the hearing, which was held on May 24, 1977, no testimony was received. The entire proof consisted of the receipt of four exhibits: (1) the decision and order of the Family Court, dated September 23, 1976, in a prior proceeding commenced by the respondents to terminate placement, which denied the petition and held that the best interests of the children required that they remain in placement; (2) A report of Dr. Antal Borbely, dated July 27, 1976, which stated that both parents were "chronically psychotic" and "not capable of caring for young children." (3) A report of Dr. Jay Robins, dated December 28, 1976. No diagnostic impression was offered and further examination was suggested. The report, *in toto,* was slightly more favorable to the respondent parents. (4) A report of Dr. Robins, dated March 25, 1977, concerning the parents and Alice, the 4-year-old daughter, which stated: "I feel that the court should consider return of the children to the natural parents." There followed the decisions and orders of June 28, 1977, which dismissed the petitions on the basis that "A thorough review of the records in evidence in this case convinces the Court that there is no basis to conclude that the respondents will be unable in the foreseeable future to care for their children." The parents are Faye K., who is presently 43 years of age, and her husband, Samuel K., who is 52 years of age. The latter emigrated to this country some 20 years ago and this is his third marriage. His first marriage, from 1957 to 1962, produced two children, presently 18 and 16, who apparently now live in Israel. His second marriage to an Israeli citizen lasted from 1963 to 1969, and produced one child, now age 11, who also lives in Israel. His current marriage took place in November, 1971. Mrs. K., a housewife, was also previously married, from 1953 to 1970, with two children born of that marriage, one girl, presently aged 21, who lives with Mrs. K.'s ex-husband, and one boy, aged 17, who lives in a boy's residence. Samuel K. was admitted to Creedmoor Psychiatric Center on two occasions. The first occasion was from March 25, 1969 to May 23, 1969, during which he was diagnosed as suffering from schizophrenia, paranoid type. He was admitted a second time as an emergency admission on June 28, 1974, and remained for about six months. The "admission note" in Mr. K.'s psychiatric file indicates that he was "brought to E. R. [emergency room] with smoke inhalation—sitting with fire in his house with 2 year old daughter. Acting strange past few weeks, throwing things, psychiatric history, mood—angry, belligerent. Says hears voice of wife and daughter, loose association, logic poor, grandiose insight and judgment—poor." Mr. K.'s "clinical summary", dated October 16, 1974, diagnoses him as "schizophrenia paranoid type". Faye K. was voluntarily hospitalized in Creedmoor State Hospital in January, 1967 because of depression. She was suicidal, had trouble coping with ordinary, routine problems and she was diagnosed as suffering from "schizophrenia, undifferentiated type." She was released sometime in March, 1967, and thereafter received private psychiatric treatment for two years. After her marriage in November, 1971, the first of the two children, Alice, was born on May 20, 1972. In June, 1974, while Faye

was five months pregnant with her second child, the K.s' house burned down. Since Samuel was admitted to Creedmoor Hospital on June 28, 1974, suffering from combined physical/psychiatric illnesses, Faye had nowhere to reside and took baby Alice to her brother's house, but "didn't get along with him." She called a social worker, who advised her to go back to Creedmoor "for a rest", as well as to be close to her husband. Her medical records for that period indicate that she entered Creedmoor as a voluntary admission on July 11, 1974, because she "Had too many pressures" and was "anxious, depressed and unable to function." While she was a resident of the hospital, she gave birth to her second child, Boaz Aaron, on November 21, 1974. She was diagnosed as suffering from "psychoneurosis, anxiety", and a Dr. Oheb declared that she "does not show any psychotic symptoms at this time [as of September, 1974] but she remains extremely nervous and apprehensive." Both she and her husband were discharged in December, 1974. Both parents have remained outside of the mental institution since 1974. It appears that Mr. K. has had periods of unemployment due to generally poor economic conditions in the construction industry. He is a licensed construction engineer. Both children have been in continuous foster care since 1974. Alice originally came into foster care in June, 1973, when, according to the appellant, an "investigation of the K's home, precipitated by an anonymous letter claiming that the father * * * went to work every morning and locked the baby's mother out of the house, resulted in the removal of the child from her home and the filing of a Petition of Neglect." The child was returned to the parents two months later upon condition that they engage a full-time nurse for Alice and remain under court supervision. The second time that Alice was placed in foster care was in July, 1974. Mrs. K. was admitted into Creedmoor, along with her husband, and, according to her, "we had no place to put [Alice]." The second child, Boaz, born in the maternity ward of Creedmoor, was placed in a foster home at the age of five days. The two children have been separated in different foster homes. Records indicate that both children are progressing quite well in their present foster homes, physically, psychologically and socially, although Alice appears to be "immature" for her age, requiring "continuous supervision." By petition dated February 23, 1976, both parents moved in Family Court, Queens County, pursuant to section 392 of the Social Services Law, for court review of the foster care and termination of placement. A hearing was held. By decision and order dated September 23, 1976, the Family Court denied the petition and concluded, "The best interests of the children at present, would indicate that they remain in placement rather than be returned to petitioners." The court stated in part: "The Court has considered all of the testimony of the parties and psychiatrists and has observed the petitioners, read the psychiatric and hospital records and based upon all of the evidence in the case, the application is denied at the present time. Dr. Borbely, Director of the Court Clinic has testified that in his opinion, Mrs. K. is psychotic and a chronic schizophrenic and not fit at present to care for her children. Dr. Luis Perlman, a qualified psychiatrist, testified that although he has known and treated Mrs. K. for over ten years, and she is a chronic schizophrenic, she is in remission and barring any abnormal stress will be able to care for her children. Dr. Borbely testified that Mr. K. is psychotic, and a chronic paranoid schizophrenic with a potential for violence. In his opinion releasing the children to petitioners would represent a danger to the children. The danger would be emotional and psychological, not physical. Dr. Perlman did not examine Mr. K. but stated that the children should not be returned without Mr. K. first being examined by a psychiatrist other

than himself. In Dr. Perlman's opinion and his knowledge of Mrs. K., any abnormal stress in the care of her children, such as a severe injury could trigger her mental illness again. Both petitioners testified. Mrs. K. in her testimony, which at times rambled to such an extent that her attorney was compelled to order her to stop talking, indicated she could take care of her children. Although outwardly she appeared able to care for her children, she was clearly a nervous, talkative woman who at times during the questioning was testifying irrelevantly and not responsively. In view of her own psychiatrist's testimony that any abnormal stress might trigger her illness, it is in the Court's opinion, unwise to release the children to her, particularly in view of the failure to have any psychiatric examination of Mr. K. by Petitioner and in view of the Court psychiatrist's findings. Mr. K. appears to be suffering from some mental disturbance. His testimony shows he is not in touch with reality. He testified he was never a patient in any mental hospital although the record shows he was twice confined to Creedmoor State Hospital, once for a period of three months and once for several months. His testimony was that in 1967 he was sent in as an agent of the Israeli Government to see how patients were treated. The reason he was sent there was that his former wife who was an Israel government worker was treated there for illness, given medication which disturbed her to such an extent that he returned her to Israel. The second time he was there in 1974, he claims was because he was burned out of his house and since his present wife had a room in a hotel at Creedmoor, after a few days he went to live there with her and their child until his home was repaired. The hospital records clearly show he was a patient in 1967 and again in 1974." The court declared that it was "not satisfied with Mr. K.'s testimony and his mental condition." The placement of both children had been extended by order of the Family Court until, at least, September 14, 1977. These proceedings were commenced on September 11, 1976, by service of a summons and petition. The petitions allege that the children have been in petitioner's continuous custody since 1974; that the parents are both too mentally ill to provide proper care for the children, and that "for more than one year following the placement * * * neither parent has been able to plan for the future of [the children] although physically and financially able to do so." The petitions requested that the children be found to be permanently neglected or that petitioner be granted their guardianship so that it could consent to adoption. There followed the hearing referred to on May 24, 1977, and the orders of June 28, 1977, dismissing the petitions. The State may not deprive a parent of the custody of a child absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances (Matter of Bennett v Jeffreys, 40 NY2d 543). Grievous cause or necessity is required as a basis for the State to supplant a parent (Stanley v Illinois, 405 US 645). But the keystone always remains, and that is the best interests of the children. Given the history of this case, a more complete hearing is indicated. Certainly, in addition to this evidence, the testimony of Drs. Borbely and Robins should have been taken, particularly in view of the age of Dr. Borbely's report. The best interests of the children should have been inquired into with more detail. Upon the presentation made, there is an insufficient basis upon which to render a determination. Suozzi, J. P., Gulotta, Margett and Hawkins, JJ., concur.