618 N.W.2d 575 (2000)
In Re RFF, Minor.
LAF, Appellant,
v.
BJF, Appellee.
Docket No. 117555, COA No. 221581.
Supreme Court of Michigan.
October 24, 2000.
On order of the Court, the motion for immediate consideration is considered, and it is GRANTED. The application for leave to appeal from the August 15, 2000 decision of the Court of Appeals also is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.
MICHAEL F. CAVANAGH, J., would grant leave to appeal.
CORRIGAN, J., dissents and states as follows:
I would grant leave to appeal in this very troubling termination of parental rights case for the reasons stated in Judge WILDER'S dissent. First, the Court of Appeals majority's construction of § 39 of the Adoption Code, M.C.L. § 710.39; MSA 27.3178(555.39) appears dubious at this juncture. I further question the majority's application of the law that they have construed to this case. Section 39 creates two categories of putative fathers and provides different standards for terminating their rights. If the majority has correctly construed the statute, then the current statutory scheme may well violate appellant-father's constitutionally protected liberty interest in the custody of his son. In any event, appellant's attempt to exercise his rights appears to have been effectively thwarted in this case. These important questions warrant our full review.
Appellant-father, then seventeen and a junior in high school, and appellee-mother, then eighteen and a senior in high school, conceived a child in summer, 1998. Their relationship ended in September 1998, shortly after appellee became pregnant. Appellee resumed dating her former boyfriend. Although rumors circulated regarding appellee's pregnancy, she persistently deceived appellant regarding her condition. She did not disclose her pregnancy to appellant. It was not until April 14, 1999, after she had already arranged for the baby's adoption and was working with an adoption agency, that she disclosed the pregnancy to appellant. During their conversation, appellee informed appellant of her desire to attend college after graduation and tentatively secured appellant's agreement to her adoption plan. Appellant immediately informed his parents about the pregnancy and they arranged to visit the adoption agency on May 10, 1999. He was given no information regarding his son's birth and the child was immediately placed with the prospective adoptive parents without any notice to appellant of his child's birth or whereabouts.
An adoption worker told appellant of the birth during his family's visit to the adoption agency on May 10, 1999. After learning of his son's birth, appellant began to cry and would not consent to the adoption. He desired to raise his son with the help of his parents, who agreed to abide by his decision. Appellant arranged an appointment with his parents and the adoption worker to discuss his desire to keep his son. One week after his son's birth, he was finally allowed to see his son at the adoption agency in the presence of the adoptive parents. This visit reaffirmed appellant's desire to obtain custody of his son. During this time, adoption agency workers also misled appellant. The adoption agency advised appellant that because the adoptive parents were paying all the costs, he need not furnish any support. Further, the adoption worker advised appellant that he had a good chance of obtaining custody. Appellant's family thereupon retained counsel. Counsel moved on May 28, 1999, for the return of the child *576 and a June 25, 1999, hearing date was set. On August 3, 1999, the court terminated appellant's parental rights after finding it was not in the child's best interests to be reared by his natural father.
The Michigan Adoption Code divides fathers into two categories: those who have established a custodial relationship with the child or have provided substantial and regular support or care in accordance with their ability to provide such support or care for the mother during pregnancy or for either mother or child after birth ("do-something" fathers) and those who have not ("do-nothing" fathers). Subsection 2 provides that a do-something father's parental rights may be terminated only "by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter XIIA." In essence, a do-something father's rights may be terminated only for abuse or neglect. By contrast, a do-nothing father's rights may be terminated under § 39(1), requiring the court to "inquire into his fitness and his ability to properly care for the child and [to] determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child."
While appellant never provided substantial and regular support or care, appellee's deception and the agency's misrepresentation were factors effectively destroying appellant's ability to provide support. Appellant correctly contends that appellee's deception regarding her pregnancy made it impossible for him to provide support or care during the pregnancy. He notes that § 39(2) requires a father to provide substantial and regular support or care in accordance with his ability to provide such support or care. Thus, appellant argues, the father's duty under § 39(2) is coextensive with his ability to comply with the duty. In addition to appellee's deception regarding the pregnancy, appellant contends that the adoption agency misled him after the child was born by assuring him that the adoptive parents would pay all costs.
The Court of Appeals majority rejected appellant's construction because the statutory language did not clearly address the situation in which a mother deceives a father about her pregnancy. The Court stated that the word "ability" could be narrowly interpreted to include only financial ability, or it could be construed "in a broader sense to encompass the situation in this case." 242 Mich.App. ___,___, 617 N.W.2d 745 (2000). Assuming the language was ambiguous, the Court interpreted the statute not to apply to deceived fathers. The Court examined legislative history to conclude that the Legislature did not intend to address deceived fathers when it amended the statute in 1998 to add the "ability" language. The Court nonetheless urged the Legislature to consider how a deceived father should be treated under § 39.
In dissent, Judge WILDER examined the legislative history and disagreed with the majority's interpretation of the Legislature's intent. He urged a construction that would permit courts to take into account a mother's deception when determining a father's ability to provide support or care. Judge WILDER favored a reversal and remand for specific factual findings on appellant's ability to provide substantial and regular support or care for appellee or the child in these circumstances. Alternatively, Judge WILDER would have reversed the trial court's findings on the statutory best-interest factors under § 39(1).
I question both the mode and result of the Court of Appeals majority's statutory analysis. A court's obligation when examining a statute is to discern the legislative intent that may reasonably be inferred from the text of the statute itself. People v. McIntire, 461 Mich. 147, 152-153, 599 N.W.2d 102 (1999). "When a legislature has unambiguously conveyed its intent in a statute, the statute speaks for itself and there is no need for judicial construction; *577 the proper role of a court is simply to apply the terms of the statute to the circumstances in a particular case." Id., p. 153, 599 N.W.2d 102. Nontextual modes of construction invariably lead to judicial speculation about the Legislature's unstated intent and the injection of the court's own policy preferences. Id.
The Court of Appeals majority here looked beyond the plain words of § 39 after assuming that the statute was ambiguous. The majority never identified, however, why the text of § 39 was "internally inconsistent or ambiguous, thereby giving rise to the need for interpretation." Id., p. 157, n. 9, 599 N.W.2d 102. Rather than struggling with the meaning of the words in the statute, the majority hypothesized that the Legislature might have restricted the term "ability" to a meaning that did not include deception by the mother. The majority suggested that the Legislature may have intended "ability" to mean "financial ability," even though no such qualification is found in the text of the statute. In essence, the majority speculated that the Legislature did not mean what it clearly stated. Judicial construction is permitted only when the words of a statute are internally inconsistent or ambiguous, not when the court speculates that the Legislature might have meant something other than what it said.
Given the importance of this statute and the enormous stakes in this case, I would grant leave to apply the correct principles of construction. The father's duty is to provide substantial and regular support or care in accordance with his "ability to provide such support or care." The father's duty is thus conditioned upon his "ability" to fulfill that duty. "Ability" means the "power or capacity to do or act physically, mentally, legally, morally, or financially." Random House Webster's College Dictionary (2000). Thus, a father's financial power or capacity to provide support or care may be only one aspect of the ability analysis under the statute. A father may also lack the physical, mental, legal, or moral power or capacity to act. When a father lacks knowledge of a pregnancy because of the mother's deception and is induced not to act by the agency's misrepresentation, he arguably lacks the power or capacity to provide support or care, since he does not even know that support or care are needed!
A separate problem exists regarding the application of § 39 to underage fathers. Does an underage father ever have the "ability" to provide support or care? If a minor cannot sign a contract or be subject to a support order, how could he have any legal "ability" to provide support or care? If the Court of Appeals majority's construction is correct, then § 39 arguably would never apply to underage fathers, and the statute would effectively collapse in upon itself. It effectively deprives all underage fathers of whatever rights they enjoy.
If the majority has correctly construed the statute, I would still grant leave to consider the serious due process issues raised by the statute's application in these circumstances. If the statute really does permit a deceived father to fall through the cracks in this fashion, then it impinges upon appellant's fundamental liberty interest in the custody of his child.
In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court held that an unmarried father was entitled to a hearing on his fitness as a parent before the state could take away his children. Illinois allowed the state to circumvent neglect proceedings for unwed fathers. It allowed termination of unmarried mothers' rights only after a hearing and proof of neglect, but unmarried fathers lost their rights without a hearing on parental fitness and proof of neglect. Invalidating Illinois' scheme, the Supreme Court noted:
The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest *578 of a parent in the companionship, care, custody, and management of his or her children comes to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements. [Id., p. 651, 92 S.Ct. 1208 (citations and internal quotation omitted).]
The right to conceive and raise one's children is fundamental. Id. "The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." Id. (citations omitted).
The Supreme Court recently reaffirmed the liberty interest of parents in the custody, care, control, and upbringing of their children. In Troxel v. Granville, 530 U.S. ___, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the Court invalidated a Washington statute that permitted anyone to petition for visitation with children and allowed a judge to award visitation upon a showing that it would be in the best interest of the children. The Supreme Court noted that the interest of parents in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." Id., 120 S.Ct. at 2060. The rights of parents under the Due Process Clause includes their right to establish a home and bring up children. Id. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Id.
The Washington statute did not require a finding that the parents were unfit before the judge awarded visitation to a third party. This scheme contravened the constitutional presumption that fit parents act in the best interests of their children. Id., 120 S.Ct. at 2061. The statute impermissibly placed the best interest determination solely in the hands of a judge and accorded no deference to the parent's judgment.
"[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Id., 120 S.Ct. at 2061.
Section 39 raises many constitutional questions. If a father's failure to provide support or care is due solely to the mother's deception, then is he denied equal protection under the Court of Appeals majority's construction of the statute? A similarly situated father who was not deceived would have an opportunity to provide support or care; his rights could then be terminated only upon a showing of abuse or neglect. The deceived father, however, will receive no such benefit; his rights may be terminated under § 39(1) solely on the basis of a judge's determination of the best interests of the child.
I also question whether § 39(1) accords the constitutionally required deference to fit fathers who were deceived. It does require the court to inquire into the father's fitness and ability to care for the child. It then goes on, however, to require the court to terminate the father's rights upon a finding that it would not be in the best interest of the child to grant custody to the father. Section 39(1) does not expressly require the court to find that the father is unfit before terminating his rights. The statute instead allows termination upon application of a free-floating best interest evaluation by a judge.
I do not know the correct outcome for this troubling case. I am not certain whether deceived fathers fall within the purview of § 39(2) and, if not, whether their constitutional rights are violated. In light of the enormous consequences of the Court of Appeals majority's decision, however, I would not let its questionable analysis stand. We should grant leave.