Matter of Alexis B. (2004 NY Slip Op 51146(U))

[*1]

Matter of Alexis B.

2004 NY Slip Op 51146(U)

Decided on October 6, 2004

Family Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 6, 2004

Family Court, Kings County
In the Matter of ALEXIS B.
B-XXXX/02

For Petitioner Child DevelopmentLaw Offices of John Eyerman,
Support Corporation By Elliot Green, Esq.
For Respondent MotherMichael J. Carlin, Esq.
For Respondent FatherRobert J. Greenfield, Esq.
Law GuardianLegal Aid Society,
By Robin Karasyk, Esq.

Nora Freeman, J.
The petition to terminate parental rights alleges permanent neglect and abandonment by respondent mother Gloria R. ("the mother") and abandonment by respondent father Jorge
B. ("the father"). The Court heard testimony from several witnesses (including the agency
caseworker, both parents and the mother's drug counselor) and received voluminous exhibits,
including case records from the current petitioning agency, the previous agency, and the mother's drug treatment program. The case was "submitted" on September 22, 1994 with a
stipulation on the record concerning the mother's drug treatment since January, 2002, when this
petition was filed. Having studied the exhibits, reviewed the testimony and assessed the credibility of the witnesses, the Court concludes that Petitioner has not proven by clear and
convincing evidence that the father abandoned Alexis for the period July 24, 2001 to January 24, 2002 but Petitioner has proven by the same standard of proof that the mother permanently neglected Alexis for a period of more than one year after he was placed in foster care.
The evidence concerning Jorge B., the father listed on Alexis's birth certificate,
who has been known to the agency since at least February 2001, is extremely limited. More than
thirty years after the Supreme Court decided Stanley v. Illinois, 405 US 645 (1972), unwed
fathers of children in foster care continue to receive only minimal attention, at least from the two agencies supervising Alexis B.'s foster care placement. Paragraph 8 of the petition claims that
for more than six months next preceding filing of the petition
[January 24, 2002] Mr. B., although able to do so and not
[*2]
prevented or discouraged from doing so by CDSC [petitioner]
did not visit or communicate with Alexis or CDSC, withheld
from Alexis [his] presence and love and otherwise failed to
perform [his] natural and legal obligations . . . by reason of which
Mr. B. abandoned Alexis....
Petitioner called the father as part of its direct case. The father's testimony, although garbled at
times (particularly concerning dates of various birthday parties) was essentially that he had
visited his son regularly at the foster home, provided cash support directly to the foster parents, and had relied on the foster parents to so inform the agency, because he speaks only Spanish and the foster parents are bilingual. Given the confusion of the testimony (which was not significantly clarified when the father testified five months later on his own case), the Court carefully reviewed the petitioner agency's case record (Petitioner's Exhibit D) and found entries on August 7 and 22, , October 29 and November 29, 2001 confirming his telephone contacts with the foster mother and his informing the caseworker that he had been visiting the child at the foster home and wishes to continue to do so. Indeed, the caseworker that noted in her August 22, 2001 progress note (Respondent mother's exhibit 1, and part of Petitioner's Exhibit D) that the "plan" is to "continue visits at foster home."
The entry dated October 29, 2001 notes that the father "informed the C/A that he visits his son in the foster home. * * * he is currently looking for employment, but so far he has been unsuccessful. Due to this, he is unable to plan for the foster child." Conspicuously absent is any mention of the caseworker assisting the father to plan. Throughout the case records of Child Development Support Corporation and St. Joseph's Services (Petitioner's exhibits D and B, respectively) there is no mention of efforts to engage Mr. B. in planning. The only "planning" appears to have been references to "surrender" of his rights and his wish that the child remain with the foster parents (the child's maternal aunt and her husband). (See entries
dated August 22 and November 29, 2001.)
It might be argued that the entries referring to the father's interest in a surrender and
on-going visitation are ambivalent; that Mr. B. had evinced an intent to forego his rights.
However, Section 384-b of the Social Services Law states that:
[A] child is abandoned by his parent if such parent
evinces an intent to forego his or her parental rights
and obligations as manifested by his or her failure to
visit the child and communicate with the child or agency ....
[emphasis added]
Since the agency's own records demonstrate that the father maintained contact with the
agency, informed them of his visits, and no evidence was presented in rebuttal, it is clear that
the abandonment charge has not been proven.
The charge of permanent neglect by the mother rests on her failure, for a period of more
than one year since Alexis was placed in foster care in July 1999 to maintain contact with the
agency and visit her child or to plan for his return. The evidence demonstrating the mother's
failure is overwhelming, including her own admissions in the case records of not having visited
for three or four months at a time (July 15, 2001 note, Exhibit D), and of continuing to be an "active user" until the fall of 2001 (as acknowledged in her testimony on August 6, 2004 and in [*3]the records of both St. Mary's and Child Development Support Corporation). The records of both agencies contain statements by the mother, repeated over many months, that she "wants her child back" and "is ready to do anything to get her child back," yet it is undisputed that she failed to complete a drug treatment program (as opposed to short-term detoxification) by January 24, 2002, when the petition was filed.
Respondent mother called her drug counselor Mr. Victor, who testified that since September 26, 2001 she has been fully compliant with treatment at St. Mary's and has tested positive for opiates only once, in late February, 2004. On September 22nd, all counsel stipulated that the mother had received pain medication before and after giving birth in February, 2004 that may have caused her to test positive for opiates on February 27, 2004.
Respondent argues that such evidence should be weighed at the fact-finding, because it
demonstrates a "substantial change in her conduct," relying on the Court of Appeals decision in
Matter of Star Leslie W, 63 NY2d 136 (1984). However, counsel's reliance is misplaced. A
careful reading of the decision reveals that the Court was addressing whether the one-year period
of "permanent neglect" had to be the twelve months immediately preceding the filing of the
petition. In holding that it did not, the Court wrote, "the statute contemplates a continuous period of one year at any time after the child's placement." Id, at 146. The Court in Star Leslie
was presented with a case in which the foster care agency filed its petition in February 1982,
but charged and proved permanent neglect for a period that ended several months earlier, in
June, 1981. The Court noted that between June 1981 and February 1982 the respondent parent might have made substantial progress. It is in the context of a delay between the end of the one-year period of neglect and filing of the petition that the Court of Appeals wrote:
That is not to say that the conduct of the parent after the
one year period of neglect should not be considered. At
the fact-finding hearing the court is obliged to consider her
conduct and commitment toward her child during the interim
if that conduct has been substantially changed, as well as the
efforts of the agency. [emphasis added]
The "interim" period in Star Leslie was June 1981 to February 1982. Assuming, arguendo, that in this case the year-long period of failure to plan ended on September 26, 2001 (the date of the mother's last positive test), the "interim period" during which the Star Leslie
rule would apply is September 26, 2001 to the filing date, January 24, 2002, a mere four months.
The mother herself acknowledged, in statements recorded in the agency and drug treatment case
records, and in her testimony, that she had abused illegal drugs, including heroin and cocaine, for over a decade. The July 25, 2001 note in Petitioner's exhibit D recounts a statement by the mother's drug counselor, Mr. R., during which he notes
He send her away to detox and she comes back clear and
stay that way for four months and then she relapse again.
In addition to being aware of the mother's long history of drug use and sad pattern of short periods of abstinence, the agency was entitled to rely on the mother's own statements, repeated several times between November 29, 2001 and January 17, 2002 (including in Family Court [*4]before Referee Spinardi, at the extension/permanency hearing held on November 30, 2001) that she wished to sign surrender documents. Taken together, the mother's four months of abstinence, at the same time she was stating she wished to surrender her rights, does not show
a substantial change in her conduct and commitment toward her child that should be considered at fact-finding.
Finally, this court respectfully disagrees with the trial court in Matter of White, New
York Law Journal, December 18, 2003, p.18, (col 3), who interprets Matter of Star Leslie W to allow evidence of a parent's conduct "post-filing." Family Court Act Section 624 plainly states that
Evidence of parental contact or failure to maintain
contact with a child subsequent to the date of the
filing . . . shall be inadmissible in the fact-finding
hearing. Such evidence may be admitted in the
dispositional hearing ....
At disposition the court will consider evidence since September 2001 that is relevant to the issue of what disposition is in the child's best interest.
For the reasons summarized above, the court finds that petitioner has not sustained its
burden of proving the father's abandonment, and directs counsel to submit a proposed order of
dismissal. The court finds further that petitioner has proven the mother's failure to visit her
child on a regular basis and to plan for a period of over one year, and accordingly adjourns the
mother's case to November 24, 2004 at ten o'clock time certain for dispositional hearing.
Based on the evidence presented thus far, the court finds that the petitions filed in November 2002 and 2003, seeking extension of placement until November 9, 2004 have been
sustained. Despite the dismissal of the abandonment petition versus Mr. B., Alexis has
remained in foster care, with no progress having been made towards discharge to his father.
Foster care is continued to November 9, 2004, with a goal of adoption. Petitioner Child
Development Support Corporation shall cooperate with the Administration for Children's
Services to assure expedited filing of a new extension/permanency petition, to be returnable
in Part 2 on November 24, 2004.
The case is adjourned for dispositional hearing on the mother's case and return of service
on the new extension/permanency petition to Part 2, November 24, ten o'clock AM time certain.
Copies of this Decision shall be mailed to all counsel.
Dated: Brooklyn, New York
 October 6, 2004
 ___________________________
J. F. C.