Pamela STYCK, Appellant (Petitioner),

v.

Ewing KARNES, Jr., Appellee (Respondent).

In re GUARDIANSHIP OF Gregory Allen KARNES, Jr.

No. 2-482A113.

Court of Appeals of Indiana, Second District.

May 9, 1984.

Samuel C. Justice, Logansport, for appellant.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Petitioner-appellant Pamela Styck (Styck) appeals the trial court's denial of her petition to terminate the guardianship of the person and estate of her son, Gregory Allen Karnes, Jr. (Greg), claiming the trial court abused its discretion in failing to terminate the guardianship and in refusing to vacate its decision on the basis of newly discovered evidence.

We affirm.

## FACTS

The facts and evidence most favorable to the judgment reveal that on May 26, 1977, Styck killed her husband, Greg's father, and was incarcerated. Greg was placed in the custody of his paternal grandfather, Ewing Karnes, Jr. (Karnes), who became permanent guardian of Greg's person and estate on June 20, 1977. In March, 1978, Styck filed a petition to terminate the guardianship, but, other than requesting a change of venue, she did not actively pursue the matter until April, 1981.

A hearing on Styck's petition to terminate took place on August 14, 1981. Evidence at the hearing showed that Styck completed her probation for the crime, obtained educational and vocational training, and sought professional counseling to cope with her emotional problems. Testimony indicated that Styck could provide an adequate home life for Greg and was capable of caring for his needs. By her own testimony, Styck did not visit, attempt to visit, communicate, or attempt to communicate with Greg while he was in Karnes's care. Styck never offered financial support for Greg. However, Styck maintained she was advised not to actively seek Greg's custody while on probation. The evidence also showed that by the time of the hearing on the petition to terminate Greg had lived with Karnes and his wife for approximately four years, enjoying a close, loving relationship with the Karneses, and that the Karnes home was adequate for the needs

of a child of Greg's age. There was other evidence as to whether Greg's interests were best served by returning him to Styck's custody or allowing him to remain in Karnes's care.

On October 9, 1981, the court entered an order confirming the guardianship in all respects, but allowed Styck supervised, alternate weekend visitation with Greg, commencing in June, 1982. Styck filed her motion to correct error on December 8, 1981, in which she asserted newly discovered evidence showing that Karnes had taken Greg and left Indiana.

At the January 14, 1982 hearing on Styck's motion to correct error, the court heard argument and considered Styck's evidence. The trial court denied Styck's motion to correct error on January 26, 1982.

## ISSUES

Two issues, consolidated and restated, are presented for our consideration:

1. Did the trial court abuse its discretion in declining to terminate the guardianship of the person and of the estate of Greg?

2. Did the trial court err in failing to reverse its October 9, 1981 decision on the basis of newly discovered evidence?

## DECISION

ISSUE ONE—Did the trial court abuse its discretion in declining to terminate the guardianship of the person and of the estate of Greg?

PARTIES' CONTENTIONS—Styck seeks to terminate the guardianship because the reason for its existence, her incarceration, no longer exists. The heart of her argument is that the trial court erred because there was no evidence that she was presently unfit. Therefore, based on the well-settled presumption that a natural parent should have custody of his or her child,

Styck argues that she is entitled to custody of Greg.[1]

CONCLUSION—The trial court did not commit reversible error in failing to terminate the guardianship of the person and of the estate of Greg.

In determining whether the trial court abused its discretion in denying Styck's petition to terminate, we must enter the sensitive and tricky area of the various statutes affecting custody and termination of parental rights.

When Styck filed her petition to terminate with the underlying hope of regaining custody of Greg, she necessarily put Greg's custody at issue because our statutory scheme defines a guardian as "one appointed by a court *to have the care and custody of the person* or of the estate, or of both, of an incompetent." Ind.Code 29–1–18–1(a) (1982) (emphasis supplied). Thus, any decision regarding the termination of a guardianship necessarily raises the question of the custody of the ward. And it is solely a question of custody of the ward that is raised by the proceeding before us. This is not a proceeding to terminate Styck's parental rights under the provisions of the juvenile code, IC 31–6–5–1 to –6 (1982).[2] Compliance with the statutory procedure of the juvenile code is mandatory to effect a termination of parental rights, but that procedure has not been followed in this cause. A parental rights termination is final and "all rights, powers, privileges, immunities, duties, and obligations (*including any rights to custody, control, visitation, or support*) pertaining to that relationship *are permanently terminated ....*" IC 31–6–5–6(a) (emphasis supplied). In effecting a parental rights termination, the par-

ties are accorded certain safeguards including mandatory notice of the proceeding to the parents and advice of their constitutional and other legal rights. *See* IC 31–6–5–2, –3.[3]

■ A similar concern for parental protection is shown by the guardianship statutes[4] which proscribe any person other than a parent from serving as a guardian of the child:

"A guardian of the estate may be appointed for any incompetent. *A guardian of the person may be appointed for any incompetent except a minor having a natural guardian in this state who is properly performing his duties as natural guardian* or a married minor who is incompetent solely by reason of his minority."

IC 29–1–18–6 (emphasis supplied). Read in conjunction with IC 29–1–18–5, this mandate clearly is not without qualification. The natural parent must be "properly performing his duties as natural guardian." IC 29–1–18–6. IC 29–1–18–5 clarifies the matter:

"*Except as otherwise determined in a divorce proceeding or in some other proceeding authorized by law, the father and the mother* jointly, if living and competent or the survivor *shall be the natural guardians of their minor children* unless such child is married. The provisions of this code respecting guardians of the person shall apply to natural guardians when applicable thereto, without appointment by or qualification in the court."

1. Karnes, the appellee, has not favored us with a brief in this case.

2. IC 31–6–2–1 (1982) vested the juvenile court with exclusive original jurisdiction in proceedings to terminate the parent-child relationship; however, that provision was amended, effective September 1, 1983, to provide that the juvenile court has concurrent original jurisdiction with the probate court in proceedings to terminate the parent-child relationship.

3. *In re Guardianship of Neff,* (1983) Ind.App., 456 N.E.2d 1045, *trans. denied,* is distinguisha-

ble from the case at bar because the Department of Public Welfare was a party to the guardianship proceeding. The question of state intervention in the parent-child relationship does not arise in this case. We disagree with *Neff* to the extent it implies that jurisdiction of any guardianship proceeding involving a minor with living natural parents is vested exclusively in the juvenile court.

4. The Cass Superior Court is vested with guardianship jurisdiction pursuant to IC 33–5–9.7–3 and IC 33–4–4–3 (1982).

(Emphasis supplied). Because the guardian of the person is, by definition, vested with custody of the ward, *see* IC 29–1–18–1(a), it logically follows that proceedings to establish or terminate a guardianship are one of the *"other proceeding[s] authorized by law"* contemplated in IC 29–1–18–5. The alternative would be to conclude that a probate court may never appoint a guardian of the person of a minor who has living natural parents. This result would nullify both statute and long-settled case law.

■ Merely because this is not a termination of the parent-child relationship does not mean that Styck's rights as a natural parent are unprotected. Indiana has long accorded great deference to the parent in any contest between a parent and another person. *See Brooke v. Logan*, (1887) 112 Ind. 183, 13 N.E. 669. The fundamental nature of the parent's interest is recognized by the courts. *See Stanley v. Illinois*, (1972) 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551; *Wardship of Nahrwold*, (1981) Ind.App., 427 N.E.2d 474, *trans. denied.* Yet, a parent's right to custody and control of the child is not absolute and will yield to the child's welfare and best interests. *See Glass v. Bailey*, (1954) 233 Ind. 266, 118 N.E.2d 800; *Kissinger v. Shoemaker*, (1981) Ind.App., 425 N.E.2d 208; *Williams v. Trowbridge*, (1981) Ind.App., 422 N.E.2d 331; *Harris v. Johnson*, (1971) 149 Ind.App. 512, 273 N.E.2d 779.

Other provisions of the guardianship statutes echo the policy of protection of the parties rights. IC 29–1–18–14(b) *mandates* notice to the parent of a minor over whom a guardianship is sought. This is similar to the protection afforded by the juvenile code termination provisions. *See* IC 31–6–5–2. The language of IC 29–1–18–5 and IC 29–1–18–6 creates a clear presumption in favor of the parent as a natural guardian—a presumption reinforced by Indiana case law. This presumption is similar to the juvenile code's policy to preserve the parent-child relationship, if possible. Finally, the harsh finality of a parental rights termination is absent from a guardianship. IC 29–1–18–47 allows a trial court great flexibility in the disposition of a guardian-ship, as illustrated by the trial court in this cause.

■ We therefore conclude that the trial court could properly entertain the question of the minor's custody as an incident to its exercise of guardianship jurisdiction, and the trial court did not err by utilizing the best interests of the child standard, as Styck would have us believe. She fails to recognize that the best interests of the child are *always* a factor for the court to consider. The sometimes competition between parental rights and the child's best interests was channeled into harmonious union by Judge Lowdermilk in *Hendrickson v. Binkley*, (1974) 161 Ind.App. 388, 316 N.E.2d 376, *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98:

> "First, it is presumed it will be in the best interests of the child to be placed in the custody of the natural parent. Secondly, to rebut this presumption it must be shown by the attacking party that there is, (a) unfitness, (b) long acquiescence, or (c) voluntary relinquishment such that the affections of the child and the third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. The third step is that upon a showing of one of these above three factors, then it will be in the best interests of the child to be placed with the third party."

*Id.*, at 393–94, 316 N.E.2d at 380. The presumption may only be rebutted by "clear and cogent" evidence. *Id.* at 395, 316 N.E.2d at 381. This analysis has been previously utilized in a guardianship proceeding. *In re Guardianship of Phillips*, (1978) 178 Ind.App. 220, 383 N.E.2d 1056.

■ The trial court heard evidence that Styck had not contested the original guardianship decree, had allowed her termination action to lie fallow from September, 1978 to April, 1981, and had failed to communicate or support Greg *in any manner* since June, 1977. The testimony of a psychiatric social worker, Karnes, and Karnes's wife reveals the strong bond between Karnes

and Greg which developed unimpeded over a period of years and the probable harm to Greg if this bond were severed. The *Hendrickson* presumption in favor of Styck's custody may have been overcome because the evidence permits a reasonable inference of a voluntary relinquishment by Styck such that Greg's affections have become inextricably interwoven with Karnes's.

While a different result might have been reached, we are privy only to the impersonal record of proceedings and cannot say that the trial court, with the parties before it, abused its discretion.[5]

ISSUE TWO—Did the trial court err in failing to reverse its October 9, 1981 decision on the basis of newly discovered evidence?

PARTIES' CONTENTIONS—Styck says newly discovered evidence, presented in her motion to correct error and at a subsequent hearing, shows that Karnes took Greg and fled the state. Therefore, the trial court should have granted a new hearing on the necessity of the guardianship because a non-resident cannot be the sole guardian of a person and because statutory procedures were not met for a change of residence of guardian and ward.

CONCLUSION—According to Styck, at some point after the August, 1981 hearing, Karnes took Greg and left Indiana. Styck attempted to raise this question in her motion to correct error by attaching affidavits to that effect. This question is not properly before this court or the trial court.

■ Our trial rules provide that newly discovered material evidence may constitute grounds for a new trial. Ind.Rules of Procedure, Trial Rule 59(A)(6). *See generally* 1 A. BOBBITT, INDIANA APPELLATE PRACTICE & PROCEDURE 336 (1972). However, "[f]acts not in existence at the time of trial do not constitute a ground for a new trial because of newly discovered evidence." 22 I.L.E. *New Trial* § 81 (1959). *See also Branstad v. Branstad*, (1980) Ind.App.,

400 N.E.2d 167; *Cassidy v. Johnson*, (1908) 41 Ind.App. 696, 84 N.E. 835.

In *Branstad, supra*, this court held that evidence of the wife's gainful employment between the time of a dissolution hearing and the time of the court's judgment on the issue of child support *did not* constitute newly discovered evidence. As in *Branstad*, Styck's newly discovered evidence did not exist at the time of trial. While this newly developed evidence may be sufficient to seek modification of the judgment, it is *not* newly discovered evidence within the parameters of a motion to correct error.

The record reveals that Karnes was present in the courtroom and testified during the August proceeding. Obviously, Karnes's absence from the state was not a fact in existence at the time of trial, and the issue of his absence is not appropriate for resolution via Styck's motion to correct error. The proper method for Styck to enlighten the trial court is through T.R. 60(B) which specifically provides her relief from a judgment.

Although not properly presented, we do observe that if Karnes is no longer a resident of Indiana, to allow him to remain guardian would directly contravene IC 29-1-18-8 (detailing the procedure by which a guardian may change the residence of the ward) and IC 29-1-10-1(b) (personal representative may not be a non-resident of Indiana—applied to guardianship via IC 29-1-18-3). The plain meaning of the statutes requires the guardian to be a resident of Indiana and not to change his residence or that of the ward without prior court approval. Such an action on Karnes's part would nullify the visitation awarded Styck and render the decision of the trial court an exercise in futility. *Cf. Marshall v. Reeves*, (1974) 262 Ind. 107, 311 N.E.2d 807 (if a dissolution decree is silent as to custodial parent's removal of the child from the court's jurisdiction, the custodial parent must have prior court approval in order to remove the child; otherwise, the continuing

---

5. Styck presented no evidence or argument to show that Karnes mismanaged the estate or

otherwise failed in his fiduciary duties as guardian of Greg's estate.

jurisdiction of the court in child custody cases would be thwarted).

Thus, we affirm as to the matters properly presented for our review, but remand to the trial court for such other proceedings as may be consistent herewith.

SULLIVAN, J., concurs.

SHIELDS, J., concurs in result with opinion.

SHIELDS, Judge, concurring in result.

I concur in result.

A guardianship proceeding is an improper action in which to litigate the issue of a natural parent's performance as a parent. That issue may only be litigated under the juvenile law, because, by preemption, the juvenile law provides the exclusive vehicle for a determination of parental fitness.

The juvenile law's preemption of the issue of parental fitness is understandable and defensible when you consider the thrust of the juvenile law is to preserve family integrity if it is reasonably possible without endangering the welfare of the child. I.C. 31–6–1–1 (Burns Code Ed., Repl. 1980). This is especially so with the adoption of a substantially new code in 1978, Acts of 1978, P.L. 136, as amended. For example, under juvenile law, a deficient parent must be offered a multitude of services, assistance, counseling, etcetera to enable the faltering parent to perform parental duties. *E.g.*, I.C. 31–6–4–16, I.C. 31–6–5–4.

Other provisions of the juvenile code serve to preserve family integrity where it is reasonably possible. For example, although removing a child from his parents and placing the child in another home or shelter care facility is a dispositional alternative in the juvenile law, this alternative must be as unrestrictive as possible so as to least interfere with family autonomy, disrupt family life, impose restraint on the child and parent and provide a reasonable opportunity for participation. I.C. 31–6–4–16. Further, if the dispositional decree re-

moves a child from his parent the juvenile court must hold a formal "review" hearing every nine months to consider modification of the dispositional decree. I.C. 31–6–4–19. At this hearing the state has the burden of showing the child should not be returned to his parent. In addition, every eighteen months the juvenile court must hold a formal hearing on the question of its continued jurisdiction. *Id.* Here again, the state must show a basis for continued jurisdiction. If it cannot, the child must be discharged or a petition for termination filed, dependent on the particular deficiency in the state's proof.

The foregoing illustrates provisions of the juvenile law designed to fulfill its intended purpose of strengthening family life by assisting parents to fulfill their parental obligations. To allow circumvention of the juvenile law, either by the state or a private individual, by perpetuating the statutory guardianship proceeding as an alternative would result in a fatal undercutting of the juvenile law.

Thus, an essential element of a statutory guardianship action which seeks the appointment of a permanent guardian of the person of a minor as against a natural parent is a prior determination in a juvenile proceeding that the natural parent is unfit, *e.g.*, the minor is a child in need of services.[1] However, in this case, Mother failed to attack the omission of this element, *i.e.*, a juvenile law determination of her unfitness, at or prior to trial. Therefore, this issue is not presented for our consideration.

Consequently, I agree with the majority's result in this case based upon its application of the rationale of *Hendrickson v. Binkley*, (1974) 161 Ind.App. 388, 316 N.E.2d 376 *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 98 (1975).

---

1. As, for example, as a result of the fact finding hearing provided by I.C. 31–6–4–14 (Burns Code      Ed., Repl. 1980).