In re the Matter of the GUARDIAN-
SHIP OF Billy Joe Lesley
THOMPSON.

Charles Wayne THOMPSON and Gay
Lynn Thompson, Appellants
(Respondents),

v.

John Joseph GORMAN and Rita Marie
Gorman, Appellees (Petitioners).

No. 4–785A207.

Court of Appeals of Indiana,
Fourth District.

Oct. 27, 1986.

James E. Foster, Funk & Foster, Hammond, for appellants.

Jeffery J. Dywan, Chudom & Meyer, Schererville, for appellees.

MILLER, Judge.

A Texas couple, Charles and Gay Lynn Thompson, appeal the appointment of Indiana resident guardians, John and Rita Gorman, over the person of their daughter, Billy Joe Lesley Thompson. The Thompsons argue guardianship proceedings are not appropriate to determine whether out-of-state parents or in-state strangers should have the care and custody of a two year old child because the juvenile code preempts the guardianship statute when the potential effect of the proceedings is to terminate parental rights and authority over their child. We agree, reverse the trial court, and remand with instructions to enter an order, pursuant to Ind. Rules of Trial Procedure 75, transferring this cause to a juvenile court of appropriate jurisdiction.

## FACTS

Billy Joe Lesley Thompson is an infant female born December 31, 1982. Charles and Gay Lynn Thompson, residents of Texas, took custody of one year old Billy Joe from her natural mother who had neglected her. The Thompsons had Billy Joe for approximately seven months and initiated adoption proceedings. The social worker assigned by the Texas court to investigate the Thompson's fitness made eight to ten home visits, found the Thompsons fit, and recommended adoption.

A few weeks before the final adoption hearing, several anonymous complaints were made to the Texas Department of Human Resources (Welfare Department) regarding the possible neglect or abuse of Billy Joe by the Thompsons, and the Welfare Department assigned a second social worker, Sharon Mills, to investigate. Mills made two home visits and states in her deposition that Billy Joe appeared to be healthy and normal and that she saw no evidence of abuse of Billy Joe. She did observe a carpet burn on the child's knee. Also, she noticed a lack of eye contact between Mrs. Thompson and Billy Joe while the child was held on Thompson's lap and found this lack of eye contact to be disturbing. Mills contacted Billy Joe's physician who stated the child had received regular and adequate medical care while with the Thompsons, and he had seen no evidence of neglect or abuse. On Mills' second visit she told Mr. Thompson she intended to keep the child abuse file open and if she found any wrongdoing under Texas law, she would have Billy Joe and the Thompsons' two sons taken out of the home and placed in foster care. The Thompsons became upset about the Welfare Department investigation and feared the loss of all three of their children and the destruction of their marriage. They consulted their attorney, J.A. Wishnew, and expressed their fears and emotional upset regarding the investigation and their

last minute hesitation to go through with the adoption. Wishnew, a Texas attorney who was also the brother-in-law of Mrs. Gorman, convinced the Thompsons that if they reneged on the adoption, Billy Joe would be placed in the custody of the Welfare Department and perhaps returned to her natural mother, who had mistreated Billy Joe. He urged the Thompsons to go through with the final adoption and turn the child over to the Gormans, an Indiana couple who wanted a child. Rita and John Gorman, both of whom had been divorced from their first spouses, were married on December 9, 1983, eight months before the Texas adoption proceedings. At the time of the Thompsons' final adoption hearing, Mr. Gorman was working as a patrolman for the Whiting City Police Department and Mrs. Gorman was employed as a beautician.

Mrs. Gorman hurried to Texas from her home in Indiana to stay in the Thompson's home for two days before the adoption and attended the final adoption hearing. With regard to the parties conduct at the Texas adoption hearing, Lawyer Wishnew was candid and testified:

> "While we went through the hearing down in Meridian, Bosque County, Rita [Gorman] held the child I believe in the back corner by the clerk's office, held the child while they went through the prerequisites, the jurisdictional statements as to residence, best interest, well, they reserved the right for the inheritance; *they went through all the things that we needed to swear to,* and while the ad litem made his testimony, elicited his testimony". (Emphasis added.) (R.P. 258).

The Thompsons gave custody of Billy Joe to Mrs. Gorman and executed their consent for the Gormans to adopt her in Wishnew's office immediately following the hearing. Mrs. Gorman returned to Indiana with Billy Joe.

The Thompsons paid Wishnew fees of nearly $2,000 for the adoption. In the next few months, the Thompsons' finances became strained and they approached Wishnew for return of the fees they paid to adopt Billy Joe. Wishnew testified here that Mr. Thompson demanded the return of Billy Joe or the payment of $5,000.00. Thompson admits asking Wishnew for money but denies he asked for $5,000.00, or that he attempted to blackmail Wishnew. Wishnew refused to pay and refused to return Billy Joe. The Thompsons withdrew their consent to adopt, as permitted by Texas law, and complained to the Texas court about Wishnew's conduct. The trial judge in Texas reported their complaint to the Texas Disciplinary Board.

The Thompsons demanded return of Billy Joe. The Gormans refused and initiated adoption proceedings in Indiana. The Thompsons came to Indiana and contested the adoption. When the adoption proceedings were unsuccessful, the Gormans then attempted to circumvent Indiana adoption laws by using the guardianship theory. The Gormans had custody of Billy Joe for only four months when this guardianship action was started. The Thompsons vigorously defended this action, claiming they loved Billy Joe, that she was not the cause of their marital problems, and that unfounded child abuse charges were the real cause of the disruption in their home. Further, the Thompsons argued they had made a mistake because of their reliance on the advice and counsel of attorney Wishnew and they wanted custody of Billy Joe.

The trial court granted guardianship to the Gormans based upon a showing by a preponderance of the evidence that the Gormans were "more suitable" than the Thompsons.

*Issues*

▪▪▪ The Thompsons present numerous issues for review on appeal.[1] We decide only the following, which is dispositive:

---

1. The Thompsons also argue 1) the trial court lacked proper personal jurisdiction and venue; 2) the proceedings were irregular and parents were denied fair trial, and 3) the evidence was insufficient to establish it was in the best interest of Billy Joe to reside with the Gormans. With regard to this last issue, the Thompsons appear to have a meritorious argument.

The evidence that the Thompsons have a satisfactory home is undisputed. Mr. Thompson is a

I. Whether guardianship or juvenile proceedings are appropriate to determine whether out-of-state adoptive parents are unfit to retain custody of their minor child and therefore custody should be granted to in-state strangers.

## DECISION

### I. *Guardianship v. Juvenile Proceedings*

■ The Thompsons contend the trial court had no jurisdiction under I.C. 29–1–18 to determine guardianship of their minor child. The Thompsons characterize the proceeding as a contested custodial determination between parents and third parties. They argue such proceedings must be brought in juvenile court under I.C. 31–6–2–1(a)(2), which provides:

(a) A juvenile court has exclusive jurisdiction, except as provided in section 1.5 of this chapter, in the following;

(1) Proceedings in which a child, including a child of divorced parents, is alleged to be a delinquent child (IC 31–6–4).

(2) *Proceedings in which a child,* including a child of divorced parents, *is alleged to be a child in need of services* (IC 31–6–4).

(3) Proceedings under the interstate compact on juveniles (IC 31–6–6.1).

(4) Proceedings under the interstate compact on juveniles (IC 31–6–10).

(5) Proceedings governing the participation of a parent, guardian, or custodian in a program of care, treatment, or rehabilitation for a child (IC 31–6–4–6).

(6) Proceedings governing the detention of a child before a petition has been filed (IC 31–6–4–5 and IC 31–6–4–6).

(7) Proceedings to issue a protective order (IC 31–6–7–14).

(8) Other proceedings specified by law. (Emphasis added).

The Gormans argue the probate court had proper subject matter jurisdiction in guardianship proceedings under I.C. 29–1–18, which provides:

4(a) Except as provided in subsection (b), the jurisdiction of the court having probate jurisdiction over all matters of guardianship, other than guardianship ad litem, shall be exclusive, subject to the

---

businessman and has taught in the public junior high school for nearly ten years. The Thompsons have two children of their own and there is no evidence in the record that either of these children have been neglected or abused. If the Thompsons are unfit to parent Billy Joe, then logically they are also unfit to raise their two natural sons. This has not been suggested by the parties.

On this issue, in the Gormans' brief—where one would expect a revelation of powerful evidence that the Thompsons are clearly unfit parents—it is only suggested that if Billy Joe were returned to the Thompsons, they would "try to sell her to another party willing to purchase, rather than adopt, a child." This argument is unpersuasive. The Thompsons did not attempt to sell Billy Joe to the Gormans. The Thompsons became alarmed by the harassment of social worker Mills and feared the loss of all three of their children and the destruction of their marriage. Mr. Thompson immediately contacted his attorney and sought advice and counsel. Instead of counseling the Thompsons and attempting to dispose of the unfounded charges of child abuse, attorney Wishnew was primarily concerned with supplying his recently married in-laws with a child and concomitantly concerned with concluding the adoption and receiv-

ing his fees. He did not provide appropriate advice and counsel to his clients who were upset and confused, and relied upon him. Instead, he manipulated the situation for his own benefit and succeeded in convincing the Thompsons it was appropriate to commit a fraud on the Texas court. The Gormans now ask the Indiana courts to perpetuate this fraud. The only evidence against the Thompsons is that they gave Billy Joe to the Gormans under these highly unusual circumstances.

In addition, it is not obvious by clear and cogent evidence the Thompsons voluntarily relinquished custody of the infant to the Gormans and did so for such a proportionate period of the child's life the affections of the Gormans have become sufficiently interwoven with her that her return to the Thompsons would endanger her future happiness. The facts are that Billy Joe was in the custody of the Thompsons for seven months before the Texas adoption proceeding; she was in the custody of the Gormans for only four months before the Indiana guardianship proceeding was instituted. This is hardly clear and cogent evidence that the Gorman's possession of Billy Joe was so lengthy as to endanger her future happiness if she were returned to the Thompsons.

right of appeal. All forms of guardianship not expressly provided for in this article, other than guardianship ad litem, are abolished . . .

5. Except as otherwise determined in a divorce proceeding or in some other proceeding authorized by law, *the father and the mother jointly, if living and competent, or the survivor shall be the natural guardians of their minor children* unless such child is married. The provisions of this article respecting guardians of the person shall apply to natural guardians when applicable thereto, without appointment by or qualification in the court.

6. A guardian of the estate may be appointed for any incompetent. *A guardian of the person may be appointed for any incompetent except a minor having a natural guardian in this state who is properly performing his duties as natural guardian* or a married minor who is incompetent solely by reason of his minority.

(Emphasis added).

In their petition for appointment of guardian over the person of Billy Joe, the Gormans alleged the Thompsons live in Texas, were unwilling to care for Billy Joe, previously gave consent to the appointment of the Gormans as guardians over the person of Billy Joe, and voluntarily placed Billy Joe in the Gormans' custody on August 13, 1984. In addition, the Gormans alleged it was necessary a guardian be appointed for Billy Joe and that *the Thompsons are not fit and proper persons to have care and custody of Billy Joe.* (R.P. 26–27). We find this proceeding was in reality a CHINS (Child In Need of Services) proceeding for which the juvenile court has exclusive jurisdiction under I.C. 31–6–2–1(a)(2), and that the juvenile code preempts the guardianship code under these circumstances.

To support their contention, the Thompsons cite *In re: Guardianship of Neff* (1983), Ind.App., 456 N.E.2d 1045. In *Neff* our First District found a probate court without jurisdiction. Judge Robertson noted I.C. 31–6–2–1 gave exclusive jurisdiction

to juvenile courts in certain circumstances. Judge Ratliff's concurring opinion focused the court's rationale upon I.C. 31–6–2–1(A)(3) [now I.C. 31–6–2–1(a)(2)]. He noted *Neff* was a case in which the question was in reality a CHINS (Child In Need of Services) proceeding ". . . for which the juvenile court had exclusive jurisdiction under I.C. 31–6–2–1(A)(3)."

We note that for most purposes, adoptive parents are considered a child's natural parents in Indiana. *In Re: Visitation of Menzie* (1984), Ind.App., 469 N.E.2d 1225, 1227. Our Probate Code vests exclusive jurisdiction over guardianship proceedings in the probate court and expresses a clear preference for parents as natural guardians. While the Probate Code does not, by its terms, deprive the probate court of jurisdiction when a child has living parents, we hold the issue of a parent's performance as a parent, including both natural and adoptive parents, may only be litigated under the juvenile law which preempts the guardianship provisions and provides the exclusive means to determine parental fitness.

■ Under these circumstances, guardianship proceedings are inappropriate to determine care and custody of a minor child between out-of-state parents and third party residents. The juvenile court must have exclusive jurisdiction over any proceedings regarding Billy Joe because the Thompsons may not be denied their parental rights to care and custody of Billy Joe without the safeguards provided in juvenile court. As Judge Shields stated in her concurrence in *Styck v. Karnes* (1984), Ind.App., 462 N.E.2d 1327:

"A guardianship proceeding is an improper action in which to litigate the issue of a natural parent's performance as a parent. That issue may only be litigated under the juvenile law, because, by preemption, the juvenile law provides the exclusive vehicle for a determination of parental fitness . . .

. . . the juvenile law [is] designed to fulfill its intended purpose of strengthening

family life by assisting parents to fulfill their parental obligations. To allow circumvention of the juvenile law, either by the state or a private individual, by perpetuating the statutory guardianship proceeding as an alternative would result in a fatal undercutting of the juvenile law.

Thus, an essential element of a statutory guardianship action which seeks the appointment of a permanent guardian of the person of a minor as against a natural parent is a prior determination in a juvenile proceeding that the natural parent is unfit, e.g., the minor is a child in need of services."

462 N.E.2d at 1332.

The Gormans, in their petition for appointment of guardian over the person, allege facts which show Billy Joe is a child in need of services pursuant to I.C. 31–6–2–1(a)(2); I.C. 31–6–4. As a result, we hold a determination in a juvenile proceeding that the Thompsons are unfit is a mandatory prerequisite to the Gormans' utilization of the guardianship statute.

■■■ We note that state intervention into the family relationship[2] is also subject to the federal constitutional restraints of the due process clause, which requires proof of parental unfitness to justify state intervention. *Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511; *Smith v. Organization of Foster Families* (1977), 431 U.S. 816, 862, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14. In

*Stanley v. Illinois* (1972), 405 U.S. 645, 658, 92 S.Ct. 1208, 1216, 31 L.Ed.2d 551, the Supreme Court relied on the guarantees of due process and equal protection to hold all parents are constitutionally entitled to a hearing on the issue of their fitness before their children may be removed from their custody. In *Parham v. J.R.* (1979), 442 U.S. 584, 597, 99 S.Ct. 2493, 2501, 61 L.Ed.2d 101, the Supreme Court recognized a rebuttable presumption that a parent acts in the best interests of his child and that the basic assumption underlying society's childrearing system is that the best interests of the child are advanced by placing the child in the parent's home because parental decision making is superior to state involvement. The Supreme Court has noted that the "due process clause would be offended if the state were to attempt to force the breakup of a natural family over the objection of the parents and their children without some showing of unfitness." *Quilloin, supra,* 434 U.S. at 255, 98 S.Ct. at 554.

■■■ We find the Thompsons, as adoptive parents, fulfill the same role with Billy Joe as natural, biological parents fulfill with their children. The Thompsons are therefore entitled to a determination of their fitness under the juvenile code before being denied care and custody of Billy Joe. In addition, the value of the Thompson family as a whole, including mother, father, two sons, and Billy Joe, is recognized by this court.[3]

**2.** The State's power to intervene in family relationships derives from two sources. The State may invoke its police power, plenary in nature, as a means to promote the public health, safety, and general welfare. Unlike the police power, the State *parens patriae* power literally meaning "parent of the country", is a limited power of the State to act as guardians to persons with legal disabilities, such as infants and mental incompetents who lack the capacity to protect their own best interests. The modern concept of *parens patriae* is subject to three limitations. First, exercise of *parens patriae* power is presumed to apply only to those "dependent" children who lack the mental competence of adults. Second, before the State acts in its capacity as *parens patriae*, the federal due process clause requires the State to demonstrate that, by clear and convincing evidence, exercise of its power

is necessary because the child's parent or custodian is unfit. Third and finally, State exercise of this power must attempt to further the best interests of the child. *See generally, Developments in the Law, The Constitution, and the Family,* 93 Harv.L.Rev. 1156, 1201 (1980); Rendelman, *Parens Patriae: From Chancery to Juvenile Court,* 23 S.C.L.L.Rev. 205, 219 (1971); Note, *the Parens Patriae Theory and Its Effect on the Constitutional Limits of Juvenile Court Powers,* 27 U.Pitt.L.Rev. 894, 905 (1966).

**3.** Kwail Baskett, about 12 years old, is the natural son of Gay Lynn Thompson and the step-son of Charles Thompson. Mrs. Thompsons first husband was killed in an accident. Colt Wayne Thompson, who is approximately the same age as Billy Joe, is the natural son of the Thompsons.

"Due process protection extends not only to the parent as an individual, but also to the family as a unit. The recognition and respect accorded the parents' right to custody affirms the family's effectiveness and importance as a social institution. Protecting family autonomy promotes important state interests. The family serves an important socialization function that prepares children to become productive members of society. The familial relationship contributes to the development of religious and cultural diversity by inculcating the child with values and encouraging his individuality. By providing for the child's health and welfare needs, the family performs an important economic function that alleviates the fiscal obligation of the state."

Hershkowitz, *Due Process and the Termination of Parental Rights*, 19 Fam.L.Q. 245, 255–56, F (1985).

The U.S. Supreme Court has used a functional definition of the term "family", which generally is recognized as providing the child with identity, intimacy, relatively consistent values, emotional support and protection. *See, Moore v. City of E. Cleveland* (1977), 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (zoning ordinance narrowly defining "family" which prohibited a woman from living with her son and two grandsons held unconstitutional; "family" includes extended family because their members unite for purposes of mutual sustenance and to maintain a secure home life); *Smith v. Organization of Foster Families* (1977) 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (limited due process protections extend to unrelated individuals in a foster family relationship because foster family fulfills same role as natural family; however, protection provided to foster family, which is an institution regulated by the state, must yield to the interests of natural parents whose right to custody derives from tradition and is not dependent upon requirements of state law.) As adoptive parents, the Thompsons enjoy all of the rights of natural parents against all others, and their interest as parents of Billy Joe must yield only to Billy Joe's interests or those of her natural parents.

The procedural safeguards provided by our juvenile code guard against erroneous termination of parental rights and the resulting severance of the parent-child and child-child relationships within the family unit, deprivation of the parent's liberty interest in care and custody of their child, and the stigma parents experience when labeled unfit to raise their children.

▆▆▆ The grant of exclusive, original jurisdiction to juvenile court mandates a reversal. In addition, our cases recognize the common law rule that the natural or adoptive parents of a minor child are entitled to custody of the child except where they are shown to be unsuitable persons to be entrusted with the care, control and education of the child. *Sanders v. Sanders* (1974), 160 Ind.App. 174, 310 N.E.2d 905. Ordinarily, a parent who is of good character and reasonably able to provide for his or her child is entitled to custody as against all others. However, the rights of parents are not absolute and can be affected by the welfare and best interests of the child. The best interest test used to decide custody disputes between natural parents and third parties was stated by this court in *Hendrickson v. Binkley* (1974), 161 Ind. App. 388, 316 N.E.2d 376:

"First, it is presumed it will be in the best interests of the child to be placed in the custody of the natural parent. Secondly, to rebut this presumption it must be shown by the attacking party that there is, (a) unfitness, (b) long acquiescence, or (c) voluntary relinquishment such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. The third step is that upon a showing of one of these above three factors, then it will be in the best interests of the child to be placed with the third party."

*Id.* at 380.

The court further stated in *Hendrickson:*

"... the court cannot determine that it is in the best interests of the child to be placed within the custody of a third party, as against the presumption favoring the natural parent, unless the trial court has first determined from clear and cogent evidence that there is either unfitness of the appellant, long acquiescence, or voluntary relinquishment. If the "best interest rule" was the only standard needed without anything else, to deprive the natural parent of custody of his own child, then what is to keep the government or third parties from passing judgment with little, if any, care for the rights of natural parents. In other words, *a child might be taken away from the natural parent and given to a third party simply by showing that a third party could provide the better things in life for the child and therefore the "best interest" of the child would be satisfied by being placed with a third party."*

(Emphasis added) 316 N.E.2d at 381.[4]

Termination proceedings may result in the permanent severance of the child's relationships with her parents and her siblings. Such proceedings not only threaten to deprive parents of the liberty interest in raising their child and maintaining their family, but also stigmatize parents by labeling them unfit to raise their children. Until parents are shown to be unfit, both parents and child share the interest in preserving family autonomy and in preventing erroneous termination of their relationship. The State has an interest in preserving the family until the showing of parental unfitness causes this interest to be supplanted by the need to protect the welfare of the child.

This action should have been conducted pursuant to the provisions of the juvenile code because the issue of whether or not a child's parent is adequately performing his duties must be litigated under the juvenile law. We remand to the trial court instructions to transfer this cause, pursuant to T.R. 75, to a court of appropriate juvenile jurisdiction.

YOUNG, J., concurs.

CONOVER, P.J., concurs in result.

---

4. Although not necessary to the disposition of this case, we observe that the trial court's use of the guardianship test to determine custody, "more suitable" by a preponderance of the evidence, exemplifies the dangers of this standard in guardianship proceedings involving a minor child and her natural or adoptive parents. In *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, the Supreme Court considered the specific standard of proof that the state must meet to terminate the rights of parents to care, custody, and management of their child and held due process requires that before parental rights may be terminated, the state must demonstrate the parents are unfit by at least clear and convincing evidence. Because parents possess a fundamental liberty interest in maintaining family integrity, clear and convincing evidence is the proper level of proof.