[Cite as *In re A.M.*, 2020-Ohio-4186.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN RE: A.M., M.M. & C.M. | : | JUDGES: |
|  | : | Hon. William B. Hoffman, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
|  | : | Hon. Earle E. Wise, J. |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | Case No.    2020 CA 00070 |
|  | : |          2020 CA 00071 |
|  | : |          2020 CA 00072 |
|  | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING:     Civil appeals from the Stark County Court of Common Pleas, Juvenile Division, Case Nos. 2018-JCV-00350, 2018-JCV-00351, 2018-JCV-01009

JUDGMENT:                 Affirmed

DATE OF JUDGMENT ENTRY:     August 21, 2020

APPEARANCES:

For Plaintiff-Appellee               For Defendant-Appellant

BRANDON J. WALTENBAUGH       DEAN L. GRASE
Stark County JFS                 700 Courtyard Centre
402 2nd St. S.E.                 116 Cleveland Avenue N.W.
Canton, OH 44702               Canton, OH 44702

*Gwin, P.J.*

{¶1} Appellant E.M. appeals from the March 6, 2020 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of A.M., M.M., and C.M., to the Stark County Department of Job and Family Services ("SCDJFS").

*Facts & Procedural History*

{¶2} E.M. is the mother ("Mother") of A.M., born on February 9, 2010, M.M., born on April 3, 2017, and C.M., born on September 7, 2018. C.M. is the father ("Father") of the children.

{¶3} On April 9, 2018, SCDJFS filed a complaint of dependency and/or neglect with regards to A.M. and M.M. The complaint alleged as follows: SCDJFS became involved with the family in January of 2018 when it was reported that A.M. was seen for a urinary tract infection; in the midst of the medical assessment, it was disclosed that A.M. had been sexually abused by her maternal grandfather and had been allowed to have continued contact with him following reports of abuse; there are concerns about untreated mental health issues in both parents, compromised judgment by both parents, and lack of appropriate supervision of the children; A.M. reported that she, at 7 years old, is responsible for cooking dinner; the agency had been involved with the family in 2011 due to lack of appropriate supervision when A.M. fell down a flight of stairs in a stroller as an infant; the agency was involved in 2016 due to concerns of lack of supervision of A.M.; and Mother's cognitive deficits and impaired judgment appears to be a persistent concern for her ability to parent her children appropriately.

{¶4} On April 10, 2018, Mother stipulated to a finding of probable cause. The trial court also appointed Bernard Hunt ("Hunt") as guardian ad litem for the children. On June 21, 2018, Mother stipulated to a finding of dependency for M.M. and a finding of abuse for A.M. The trial court approved a case plan, and placed A.M. and M.M. in the temporary custody of SCDJFS.

{¶5} SCDJFS filed a complaint of dependency with regards to C.M. on September 10, 2018, three days after she was born. The complaint alleged, in part, that SCDJFS had two open and active cases regarding A.M. and C.M. due to concerns involving sexual abuse and the parents' failure/unwillingness to protect the children from further abuse. After taking testimony on November 21, 2018, the trial court found C.M. to be a dependent child and placed C.M. in the temporary custody of SCDJFS.

{¶6} SCDJFS filed a motion for permanent custody with regards to A.M. and M.M. on November 15, 2019, and C.M. on November 22, 2019.

{¶7} The trial court held a trial on the motions for permanent custody on February 25, 2020. Counsel for Father stated that Father did not contest the motion for permanent custody and felt it was in the best interest of the children for the motion to be granted.

{¶8} Amy Craig ("Craig"), a caseworker for SCDJFS, first became involved with the family on January 31, 2018. Craig testified that A.M. and M.M. have continuously been in agency custody since June 21, 2018. C.M. has continuously been in agency custody since November 21, 2018.

{¶9} Craig testified to the initial allegations that brought the family to SCDJFS. While at the emergency room being treated for a urinary tract infection, A.M. reported that she was sexually abused by her grandfather, and, after this report, Mother continued to

allow grandfather to babysit the children. Throughout the case, Mother has been unclear as to whether she believes A.M.

{¶10} Craig testified about Mother's case plan. Mother was asked to follow through with mental health treatment and she has been going to Phoenix Rising. Mother completed a parenting assessment through Northeast Behavioral Health and completed some recommendations from this assessment, such as attending Goodwill Parenting classes and going to joint counseling.

{¶11} As to parenting classes, Mother attended parenting classes twice. The first time she received a certificate of non-compliance, as it was recommended that she repeat the class once she addressed some of her relationship issues and her childhood trauma. There were also concerns that Mother did not retain the information provided in class. After Mother attended parenting class a second time, there were still concerns, including Mother's inability to protect her children, the fact that her baby-sitting plan was not realistic, and treating the children at younger developmental ages than they actually were. During Mother's second parenting class, she received a certificate of attendance, but it was not considered a successful completion of the class because of concerns with Mother's goals.

{¶12} Craig stated that while Mother struggled during visits with engaging all three children, overall the visits were okay and were not a major concern.

{¶13} Craig testified it is the agency's position that Mother has not made enough progress to safely reunify her with the children. Craig believes the agency has exercised reasonable efforts to try to assist the family. Craig testified the children deserve

permanency, there are compelling reasons to grant permanent custody to the agency, and the children have all spent in excess of one year in the agency's custody.

{¶14} On cross-examination, Craig confirmed the issues with Mother centered around the parenting classes. While testing was a part of the concern, there were other concerns such as lack of accountability and lack of ability to safely protect the children.

{¶15} In the best interest portion of the trial, Craig testified the three children are placed together at a foster home. They have been in this home for the past two years and are bonded to the foster parents. A.M. is in school with an IEP for issues with speech, communication, language, and receives intervention with math, reading, and writing. A.M. is improving in school and is making positive progress. A.M. had a history of urinary tract infections, but is now medication-free and is not having any issues.

{¶16} M.M. is small for his age, but is otherwise healthy. C.M. is small for her age and has some medical issues, but the foster parents are following up with the doctor's recommendations. Mother does have a bond with the children, especially with A.M. However, A.M. wants to be safe.

{¶17} The foster family has indicated a desire to adopt the children. Craig testified the children will benefit from adoption and they need permanency. While A.M. loves her parents, Craig believes A.M. deserves and needs to be kept safe. Craig does not think going home with Mother would be a safe option for A.M. Craig believes it is in the best interest of the children for the trial court to grant permanent custody to SCDJFS.

{¶18} The GAL filed his report and testified at the hearing that it is in the best interest of the children if the trial court were to grant permanent custody to SCDJFS. In his report, Hunt noted that Mother's relationship with R.T., a family friend, was not

productive or helpful to her progress, as she listened to him rather than her attorney or the agency employees. Hunt did not see Mother utilizing the skills offered in parenting class. In support of his recommendation, Hunt stated the following concerns remain: Mother's relationship with R.T., who attended court hearings and team meetings; her failure to complete Goodwill Parenting; Mother's inability to safely parent the children, as she has not shown the ability to manage the children without assistance; and the children have health issues beyond the ability of Mother to address.

{¶19} Dr. Amy Thomas ("Thomas") of Northeast Behavioral Health completed Mother's parenting evaluation. Mother was functioning within the below-average range of intellectual ability, suggesting she would need additional support to explain parenting instruction. Mother reported she previously was diagnosed with bipolar disorder. Thomas stated Mother also presented with dependent personality disorder, manifesting in unhealthy relationships. Mother described to Thomas a very unhealthy relationship with Father plagued with verbal and physical abuse. Mother reported to Thomas that her father was very abusive and she witnessed her father rape her mother. However, Mother had questions about A.M.'s abuse allegations. Thomas testified since Mother doubted A.M., there were concerns about her willingness to protect A.M. in the future.

{¶20} Thomas made several recommendations for Mother: continue counseling to process her own childhood abuse; remain medication compliant; marital counseling; successfully complete Goodwill Parenting; identify an appropriate support system; and, if abuse continued with Father, identify another healthy living condition and support network.

{¶21} Thomas testified if Mother was not able to successfully complete parenting class, Thomas would be concerned, as she would want to make sure Mother can keep the children safe and manage their special needs. Given the special demands presented by the children, including autism and their young ages, Thomas felt it was important that Mother satisfactorily complete the parenting program to meet their needs. Thomas also noted the program was important because it reinforced the importance of having the children only supervised by appropriate people so that they would not be exposed to violence or subjected to abuse.

{¶22} On cross-examination, Thomas testified she is familiar with the Goodwill Parenting program and stated they tailor the program to those with cognitive disabilities like Mother.

{¶23} Kelsey Kiggins ("Kiggins") is the instructor for the first and second Goodwill Parenting sessions that Mother attended. In describing the goals accepted by Goodwill, Kiggins stated Mother was unable to explain what many of them meant and thus many of her goals were rejected. Kiggins recommended Mother repeat the class because of the issues with her goals, along with a lack of understanding of her responsibility in the involvement with the agency. At the first session, Mother received a certificate of non-compliance, which means Mother failed to complete a minimal amount of course requirements. Kiggins testified that, due to Mother's lower IQ, there were multiple accommodations offered, including receiving assistance with the post-test. During the first session, Mother declined any accommodations. After the first session, Kiggins recommended that Mother continue with individual counseling, with a focus on accountability and determining appropriate caregivers.

{¶24} Mother did somewhat better during the second class session and utilized the offered accommodations. More of her goals were accepted, and her post-test score improved. Mother received a certificate of attendance, which means she completed a minimal amount of course requirements. Despite the certificate of attendance and improvement in the second session, Kiggins did not recommend reunification between Mother and her children due to: continued concerns in Mother's ability to provide her children with appropriate caregivers; concerns about her ability to protect the children from being exposed to future abuse; and concerns with Mother's accountability, as she gave inconsistent disclosures surrounding events leading up to the involvement with SCDJFS. Kiggins testified that Mother continued to present a safety risk to her children.

{¶25} Kiggins testified Mother initially struggled with being able to supervise all three children simultaneously and provide them with appropriate interactions. However, Kiggins saw some improvement during the visits.

{¶26} On cross-examination, Kiggins explained that the ultimate decision as to whether someone passes the class is not specifically based on test score and not specifically on how many goals they completed, but it based on a combination of all of the course requirements, including the test score, application of skills at the visits, program goals, the ability to demonstrate insight and apply skills, whether they are applying appropriate decision-making skills, and the ability to make positive changes to reduce risk for the children. Kiggins does not believe this is a subjective process.

{¶27} Lela Tournoux ("Tournoux") is Mother's best friend. Tournoux has seen Mother with her two oldest children and describes her parenting skills as good. Mother sometimes babysits Tournoux's daughter. Cynthia Salmon ("Salmon") is a friend of

Mother. Salmon testified she saw Mother with A.M. and Mother's parenting skills were good.

{¶28} Mother testified that since February 2018, she has been compliant with counseling. Mother believes she now understands what she needs to do to take care of her children. Given another chance, she believes she can keep her children safe because she now knows she should ask for help and use daycare instead of allowing her children to be around her father. Mother knows she has made mistakes, but loves her children and stated now she can do better.

{¶29} The trial court issued a judgment entry on March 6, 2020, terminating Mother's parental rights with regards to A.M., M.M., and C.M, and granting permanent custody of the children to SCDJFS. Simultaneously, the trial court issued extensive findings of fact and conclusions of law. With regards to A.M. and M.M., the trial court determined that since they have continuously remained in the custody of SCDJFS from June 21, 2018 until the date of the hearing on February 25, 2020, they have been in the custody of the agency for a period greater than twelve months of a consecutive twenty-two-month period.

{¶30} The trial court found Craig's, Thomas', and Kiggans' testimony to be credible. The trial court stated the biggest concern with Mother is her ability to safely parent, as well as concerns about her ability to protect and accept accountability. The trial court noted that Mother had absolutely no accountability for her actions which resulted in A.M. being abused by maternal grandfather and, even after twenty-two weeks of parenting classes, it was still the opinion of Goodwill that Mother could not reunify with the children.

{¶31} The trial court reviewed several exhibits admitted into evidence, including Thomas' evaluations. Pursuant to Thomas' latest evaluation, Mother would require a highly structured approach to parenting skill training. Thomas opined that Mother must show she can establish independent housing, identify an appropriate support system, and attend Goodwill classes and follow their recommendations. The court found the testimony of Kiggans and Mother's own testimony showed that Mother is not able to retain the information provided to her by Goodwill and Mother is not able to ensure the safety of the children. Mother detailed to Thomas extensive and almost daily physical abuse of her by her father and Mother alleged that her father raped her mother almost daily. Despite these past experiences, Mother let her father watch A.M. Thomas summarized her report as follows, "[a]t present, Mother's prognosis is not favorable. This examiner questions Mother's ability to competently raise three young children, including a child who was recently diagnosed with Autism Spectrum Disorder, a toddler, and an infant * * * Mother's cognitive deficits, limited support system, and depression can make this task even more challenging." As to her ability to protect her children, Thomas stated in her report that, despite Mother's knowledge of her father's anger issues and risk of sexual abuse, she nevertheless relied on her parents and sister heavily to watch A.M. before school, after school, and in the evening.

{¶32} The trial court also reviewed the report written by Kiggans, noting the problems with the first session of the parenting class and stating that while the second session was more positive, Goodwill did not recommend reunification based upon Mother's lack of understanding of who would be appropriate caregivers for her children, lack of accountability, and lack of her ability to protect the children. The trial court cited a

portion of Kiggans' report, "Mother was unable to develop a safe, practical plan to protect her children from any abuse in the future and provide them with appropriate caregivers as needed." The trial court also specifically cited the section of Kiggans' report in which Kiggans stated that while Mother demonstrated improvement in some aspects of the program, she did not successfully complete the program. Kiggans stated, "there remain grave concerns regarding her ability to apply relevant content in her daily life and provide her children with protection in the future * * * concerns remain regarding Mother's ability to adapt to and meet her children's ever changing needs * * * It was also apparent Mother viewed her children in the same developmental frame as they were prior to removal." Kiggans concluded, "there are grave concerns regarding Mother's ability to protect each of her children in the future and assist A.M. in the trauma she had already endured." The trial court agreed with the summary set forth by Kiggans in her report.

{¶33} The trial court found Mother failed to protect A.M. and found it very concerning that while Mother acknowledged the agency became involved because of the sexual abuse, Mother continued to have doubts about whether this abuse occurred. The trial court specifically stated that Thomas was accurate in her assessment of Mother and her assessment as to how Mother's deficits would negatively impact Mother's ability to retain the information provided in the parenting classes. Additionally, the trial court agreed with Kiggans' report and stated that while Mother visits her children and loves them, it is not safe to have the children reunite with Mother and nothing further can be attempted to assist Mother in regaining custody.

{¶34} The trial court found the witnesses presented by Mother lacked credibility. With regards to Mother's testimony, the trial court found the testimony "painful to hear,"

as she "had much difficulty maintaining her focus and made statements which, in reality, confirmed the conclusions drawn by Dr. Thomas and Ms. Kiggans."

{¶35} The trial court concluded that, notwithstanding reasonable case planning and diligent efforts by the agency, Mother has failed to remedy the conditions that caused A.M., M.M., and C.M. to be placed and the children cannot be placed with Mother within a reasonable time, nor should they be placed with Mother.

{¶36} The trial court then made findings with regards to the best interest portion of the trial. The court found Craig gave credible testimony and stated the guardian ad litem recommended permanent custody of A.M., M.M., and C.M. to SCDJFS is in the best interest of the children. The trial court found A.M. and M.M. are bonded to Mother, but they deserve and need to be kept safe. Thus, the benefit of permanency outweighs any harm caused by severing the parental bond. The trial court found it is in the best interest of the children for permanent custody to be granted to SCDJFS.

{¶37} Mother appeals the March 6, 2020 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, and assigns the following as error:

{¶38} "I. THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO THE STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES (SCDJFS) AS THE RELIANCE UPON THE APPELLANT'S RESULTS IN THE GOODWILL PARENTING SKILLS TRAINING PROGRAM VIOLATES THE APPELLANT'S RIGHT TO DUE PROCESS AND "FUNDAMENTAL FAIRNESS" UNDER THE 5TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION."

*Permanent Custody*

{¶39} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

{¶40} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶41} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶42} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court

schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

{¶43} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶44} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

I.

{¶45} In her assignment of error, Mother argues the trial court committed error in its determination that, notwithstanding reasonable case planning and diligent efforts by the agency, Mother has failed to remedy the conditions that caused A.M., M.M., and C.M.

to be placed and the children cannot be placed with Mother within a reasonable time, nor should they be placed with Mother.

{¶46} We first note the trial court determined, pursuant to R.C. 2151.414(B)(1)(d), that A.M. and M.M. have been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. Craig testified that A.M. and M.M. have continuously been in agency custody since June 21, 2018. Thus, A.M. and M.M. have been in the custody of the agency for more than twelve out of the last twenty-two months.

{¶47} As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni*, 5th Dist. Tuscarawas No. 2007 AP 0041, 2007-Ohio-5805. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun*, 5th Dist. Stark No. 2008CA00118, 2008-Ohio-5458.

{¶48} Because Mother has not challenged the twelve of twenty-two-month finding as to A.M. and M.M., we would not need to address the merits of this assignment of error. However, as to C.M. and even if we consider Mother's argument with regards to A.M. and M.M., the trial court did not err in determining the children cannot be placed with Mother at this time or within a reasonable period of time. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶49} Mother argues she was denied her right to "fundamental fairness" under the Due Process Clause because SCDJFS delegated the determination of her constitutional right to a relationship with her children to a non-judicial entity, the Goodwill Parenting Program.

{¶50} In support of her argument, Mother cites *Price v. Nixon*, 2nd Dist. Clark No. 2010-CA-058, 2010-Ohio-2430. However, we find *Price* is not analogous to the instant case and is thus unpersuasive. In *Price,* the Second District Court of Appeals held that the trial court failed to afford the appellant due process because the trial court did not provide the appellant with notice of the possibility that it could award custody to a non-parent, nor did the court provide the appellant with an opportunity to cross-examine witnesses on such an award. *Id.* In this case, both SCDJFS, through its motion for permanent custody, and the trial court during the hearing, provided appellant clear notice of the possibility that it could grant permanent custody to SCDJFS. Additionally, the trial court provided appellant with the opportunity to cross-examine all of SCDJFS' witnesses.

{¶51} We disagree with Mother's contention that the trial court improperly delegated the decision as to whether her parental rights should be terminated to the Goodwill Parenting Program. In its judgment entry, the trial court issued extensive findings of fact and applied them to detailed conclusions of law in order to complete the analysis pursuant to R.C. 2151.414(B). The trial court, rather than those at Goodwill Parenting, made the legal determination pursuant to the relevant statutes as to whether there was clear and convincing evidence to grant permanent custody to SCDJFS. Further, the trial court did not solely consider or rely on the testimony and reports of Kiggans. In addition to the testimony and report of Kiggans, the trial court also considered

all of the relevant evidence, and cited to the testimony of Craig, the testimony/report of Thomas, and the recommendation of the guardian ad litem, in support of its decision. The failure to complete the parenting class was just one of several reasons on which the court based its decision.

{¶52} Mother asserts that Kiggans' testimony is not credible and thus the trial court erred in relying on her testimony to determine the children cannot and should not be placed with Mother within a reasonable period of time. Mother cites to Kiggans' relatively short time at Goodwill and the fact that Kiggans believes the passing or failing of Goodwill Parenting is not a subjective process. However, issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). During her testimony, Kiggans detailed her education, her qualifications, her job description, and how she collaborates and receives feedback from her supervisor. Additionally, Kiggans detailed how the ultimate decision of whether someone passes the parenting class is made and testified to a combination of the course requirements, including test scores, application of skills, program goals, the ability to demonstrate insight and apply skills, making appropriate decisions, and reducing the risk to the children. Counsel for appellant had the opportunity to cross-examine Kiggans. We find the trial court did not commit error in relying on Kiggans' testimony.

{¶53} Further, even if the trial court did commit error in relying on her testimony, the trial court considered all of the relevant evidence, and relied on the testimony, evidence, and recommendations presented and made by other witnesses, including

Thomas, Craig, and Hunt, to meet the clear and convincing evidence standard pursuant to R.C. 2151.414(B)(1) and Under R.C. 2151.414(E).

{¶54} Finally, Mother contends that if she had attained successful completion of the parenting skills class, she would have completed her case plan and would have been allowed to reunify with her children. We disagree. The trial court considered other evidence, such the testimony and recommendations of Craig, Thomas, Hunt, and the testimony of Mother herself, in its decision. As this Court has held, the successful completion of a case plan is not dispositive on the issue of reunification. *In the Matter of A.H.*, 5th Dist. Richland No. 18CA96, 2019-Ohio-1509. While it may be in Mother's best interest to complete the case plan, this is only one factor for the trial court to consider. *Id.* Where a parent has participated in his or her case plan and completed most or all of the plan requirements, a trial court may still properly determine that such parent has not substantially remedied the problems leading to agency involvement. *Id.* That is the determination the trial court made in the instant case.

{¶55} A review of the record supports the trial court's conclusion that the children cannot be placed with Mother within a reasonable time. At the time of the hearing, both A.M. and M.M. had been in the agency's custody for almost two years. Despite Mother's substantial compliance with the case plan and the fact that she loves her children very much, significant concerns remain with her ability to care for the children and the same problems that led to the initial removal remain in existence. Craig testified that Mother has not made enough progress to safely reunify her children after several years. She further testified the children deserve permanency. Hunt testified that several concerns remain, including Mother's relationship with R.T. and Mother's inability to safely parent

the children, as she has not shown the ability to manage the children without assistance. Thomas stated in her testimony and in her report that she questioned Mother's ability to raise three young children and was concerned about Mother's ability to protect her children in the future. Kiggans testified that she did not recommend reunification between Mother and the children because Mother lacked the ability to protect and provide for the children.

{¶56} We find there is competent and credible evidence to support the trial court's finding that the children cannot be placed with Mother within a reasonable amount of time and should not be placed with Mother. This determination by the trial court did not violate Mother's right to Due Process or "fundamental fairness."

{¶57} Based on the foregoing, we find the trial court did not abuse its discretion in granting permanent custody of A.M., M.M., and C.M. to SCDJFS.

{¶58}    Mother's assignment of error is overruled and the March 6, 2020 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, is affirmed.


By Gwin, J.,

Hoffman, P.J., and

Wise, Earle, J., concur